**JOHN J. ZIDZIUNAS, ESQ., BAR ID: 036522005**
**JOHN J. ZIDZIUNAS & ASSOCIATES, LLC**
**354 Eisenhower Pkwy, Suite 1250**
**Livingston, NJ 07039**
**(P) 212-516-1868**
***Employmentdiscrimination.com***

**NY OFFICE:**
**225 Broadway, 38th Floor**
**New York, NY 10007**
**(P) 212-516-1868**
***Attorneys for Plaintiffs Elizabeth Straus,***
***Dr. Brandon Howard and Meagan LaDue***

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ELIZABETH S. STRAUS, DR. BRANDON HOWARD and MEAGAN LADUE**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DANIEL E. STRAUS (In His Individual and Professional Capacities); CARE ONE LLC; EMILY VAZQUEZ, (In Her Individual and Professional Capacities); CARE REALTY, LLC; CARE ONE MANAGEMENT, LLC; CARE SERVICES, LLC; CARE SOLUTIONS, LLC; PARTNERS PHARMACY, LLC; ASCEND HOSPICE; BRIDGECARE, LLC; TOTAL CARE, LLC; STRAUS GROUP, LLC; JOHN DOES 1-10; AND XYZ CORPS. 1-10,**<br><br>**Defendants.** | **Docket No.: [To be assigned]**<br><br><br><br><br><br><br>**COMPLAINT AND**<br>**JURY DEMAND** |

Plaintiffs, Elizabeth S. Straus ("Plaintiff Straus" or "Ms. Straus"), a resident of Englewood, New Jersey, Dr. Brandon Howard ("Plaintiff Howard" or "Dr. Howard"), a resident of Mountain Lakes, New Jersey, and Meagan LaDue, a resident of California, ("Plaintiff" or "Plaintiff LaDue"), by way of this Complaint against Defendants, Daniel E.

Straus ("Defendant Daniel E. Straus") (in his individual and Professional Capacities); Care One, LLC ("Care One"); Emily Vazquez, (In her Individual and Professional Capacities); Care Realty, LLC; Care One Management, LLC; Care Services, LLC; Care Solutions, LLC; Partners Pharmacy, LLC; Ascend Hospice; Bridgecare, LLC; Total Care, LLC; Straus Group, LLS; John Does 1-10; and XYZ Corps. 1-10, (hereby collectively "Defendants") hereby says:

## I.    INTRODUCTION

Plaintiffs bring this whistleblower action alleging, *inter alia*, over One Billion, Five Hundred Million Dollars ($1,500,000,000) in Medicare fraud violations (as trebled pursuant to 31 U.S.C. §3729(a)(1)) committed by Defendants for their extensive and ongoing violations of utilizing the "Care One Enterprise" as a criminal racketeering enterprise to commit and conceal over $500 million dollars in Medicare fraud, sex trafficking, sexual exploitation, obstruction of justice, extortion, bribery/kickbacks, stalking, harassment, healthcare fraud, retaliation and abuse of power.  The evidence demonstrates that Defendants coordinated a scheme to silence whistleblowers and conceal systemic Medicare fraud, sexual coercion and sexual abuse. This case arises from Defendants' unlawful retaliation against whistleblowers' Physician (Plaintiff Dr. Howard), and Executive Vice President (Plaintiff Elizabeth Straus) for exposing and objecting to systemic fraud within the Care One network and affiliated Companies all owned and controlled by Defendant Daniel E. Straus. During September 2023 to April 2024, Plaintiff Elizabeth Straus witnessed hundreds of million dollars in Medicare revenue falsely billed by Care One through Medicare fraud, kickback and illegal inducements of Medicare referrals.  Additionally, this case is brought on behalf of Defendant Daniel E. Straus' former Executive Assistant, Plaintiff Meagan LaDue, whom Defendant Daniel E. Straus asserted complete control over Ms. LaDue's personal and professional life and requiring her to engage in forced sexual acts in multiple jurisdictions while coerced under alcohol, job security, and housing paid for by Defendants.

Defendant, Daniel E. Straus, is and was at all times the founder, majority owner and chairman of Defendant Care One, LLC and the other corporate Defendants. Defendant Emily Vazquez was at all times relevant the Executive Vice President of Care

One and Director of Special Projects running the operations for Defendant Daniel E. Straus while providing Defendant Daniel E. Straus sexual gratification and procuring, sexually coercing, and trafficking other employees for her own sexual gratification. As evidenced by the numerous complaints brought to the Human Resource Department and prior lawsuits filed against Defendants, Defendant Daniel E. Straus' actions demonstrate a pattern of sexual predatory behavior who used Care One as his sexual playground and enterprise for sex trafficking. Defendants, each of them, were senior management level employees who controlled all of the Plaintiffs' workplace, who aided and/or abetted in the commission of conduct complained of herein, and/or who either acted within the scope of their employment at the workplace site during working hours, or, to the extent they went beyond the scope of their employment, Defendants ratified, embraced and created the illegal alleged conduct. The evidence demonstrates Defendant, Daniel E. Straus, abused corporate, legal and fiduciary structures—including Trust funds, employment contracts, and various types of surveillance systems to maintain personal power, suppress dissent, and silence victims. This pattern of criminal conduct constitutes racketeering activity under federal law.

These unlawful and objectively appalling behaviors committed by Defendants include, but are not limited to, the following:

**Defendants' Violations of Sexual Harassment, Sex Trafficking & Sexual Coercion**

- Plaintiff, Elizabeth Straus, is Defendant Daniel E. Straus' biological daughter and has been the victim of sexual abuse and inappropriate sexual conduct by her father since childhood and continued into her adult life while working under the submission of her father at Care One over a span of nearly fifteen (15) years;

- During Plaintiff Elizabeth Straus' employment with Care One, Defendant Daniel E. Straus' girlfriend, Executive Vice President of Care One and Director of Special Projects, Defendant Emily Vazquez, frequently engaged in sexually inappropriate conduct by touching Plaintiff Straus in a sexual manner, making inappropriate sexual comments and flirtations about how nice her breasts and body looked, frequently making sexually inappropriate jokes, and frequently making overt sexual advances towards her inside and outside the presence of Plaintiff Straus' father, who desired to have a "threesome" with Plaintiff and her father, Defendant Daniel E. Straus;

- On multiple occasions, Defendant Vazquez explicitly stated to Plaintiff Straus in a *quid pro quo* manner that it would "please her father" to have sex in Defendant Daniel E. Straus's presence. To condition Plaintiff Straus and psychologically break her down to submit to the same, Defendant Daniel E. Straus placed Plaintiff in an impossible position between her father's coercion, her personal financial survival tied to Plaintiff Straus' financial Trust controlled by her father, and Defendant Vazquez's abusive control of her day-to-day role in Care One;

- Defendant Vazquez would regularly show Plaintiff Straus both in and outside the workplace at Care One sexually graphic videos of herself engaged in sexual acts with other men and women—including footage she claimed had been shown to Defendant Daniel E. Straus for his sexual gratification;

- Defendant Vazquez frequently would state, in sexually graphic terms, how she wanted to "have sex with Elizabeth" in front of Defendant Daniel E. Straus because "that's what turned him on." Defendant Vazquez regularly conditioned Plaintiff Straus' standing in the organization—and with her father—on participating in sexual activity, including explicit pressure for Plaintiff Straus to have sex with Defendant Vazquez. This included verbal coercion, sexual intimidation, and explicit power dynamics that made refusal professionally and personally dangerous;

- Defendant Daniel E. Straus using Care One as a criminal enterprise to engage in a covert sex trafficking operation led by his SVP, Defendant Emily Vazquez, who served as both a "Madame" recruiter and enforcer within Defendants' sexual exploitation scheme;

- Defendant Vazquez orchestrated a Care One-based sexual enterprise that targeted vulnerable subordinate female and male employees in various jurisdictions, including but not limited to, Massachusetts and New Jersey and other Care One locations for grooming, sexual exploitation, and forced sexual submission under threats of professional retaliation, termination, and/or public humiliation. Defendant Vazquez cultivated a toxic work environment where sexual favors were openly traded for promotion, access, career security--all done at Co-Defendant Daniel E. Straus' aiding, abetting and approval;

- Defendants Vazquez and Daniel E. Straus have exhibited a pattern and practice of using Care One as a criminal enterprise for sexual abuse, harassment, retaliation, and exploitation as evidenced by numerous lawsuits and claims filed against them asserting such allegations, such as: <u>Kim Velez v. Care One, LLC, Daniel Straus and Sen. Robert Torricelli, et al</u>, BER-L-4758-06<u>; Care One, LLC, v. William G. Burris Jr., et al</u>, BER-C-158-09; <u>Christina Carrona v. Care One Management, LLC, and Emily Vazquez</u>, MON-L-1139-23; <u>Blalock v. Partners Pharmacy, LLC,</u> 2:23-cv-03814; **(See "Ex. A" attached hereto, Emails to and from Velez and Daniel Straus)**

- In addition to the female employees who filed actual lawsuits against Defendant Daniel E. Straus, Vazquez, and the corporate Defendants, there are numerous other Care One employees who are victims of sexual assault, abuse, and harassment that will testify against Defendants Daniel E. Straus, Vazquez and Care One's culture of rampant sexual abuse, including:

  - In 2007, Defendant Daniel Straus' Executive Assistant, C.O., filed multiple sexual harassment complaints with HR against Defendant Daniel E. Straus. C.O. was in her early 20's when she was allegedly sexually harassed by Defendant Daniel E. Straus who demanded sex in order for C.O. to keep her job.

  - In 2010, Defendant Daniel E. Straus was sued by former Construction and Development Officer of Care One, William Burris, who sued Defendant Daniel E. Straus for terminating him in retaliation for reporting Defendant Daniel E. Straus for sexually assaulting a 20-year-old female employee, J.O.

  - In 2013, former employee, M.D. filed a HR complaint against Defendant Daniel E. Straus that he sexually harassed her when she was 20 years old at the time, demanding oral sex from M.D. in the workplace while Defendant Daniel E. Straus was 57 years old due to his penchant for extremely younger women.

  - In 2016, former marketing employee, B.M. was pressured to attend dinner with Defendant Daniel E. Straus. Defendant Daniel E. Straus got drunk at dinner, began touching B.M.'s inner thigh, and despite her

telling him not to, he continued to shove his hand into her vaginal area to violate her and as she protested, he threatened that if she didn't comply with his demands, she would be without a job.  She immediately brought this to HR's attention and was no longer comfortable coming to the Fort Lee office for meetings and feared retaliation.  In or around January 2022, B.M. was terminated and paid "hush money" for her silence.

- In 2018, former Care One marketing employee, L.C., filed a major HR complaint against Defendant Daniel E. Straus for sexual harassment and sexual assault after Defendant Daniel E. Straus, while drunk, began rubbing his hands on her legs during a dinner without L.C.'s consent. In exchange for her claims, L.C was paid a "hush money" confidential settlement.

- In or around July 2018, Defendant Daniel E. Straus' Executive Assistant, J.C., brought forward allegations of sexual harassment against Defendant Daniel E. Straus that he would regularly proposition her for sex in the workplace.  She complained to HR and then shortly after that, she alleged Defendant Daniel E. Straus began retaliating against her thus leading to her resignation and hiring a lawyer to bring forth her allegations.  Defendant Daniel E. Straus paid J.C. a six-figure settlement in "hush money" to conceal the claim.

- In 2019, former Administrator, K.K., filed a complaint with HR that while out to dinner with Defendant Daniel E. Straus and while he was extremely intoxicated, he forcibly, violently and digitally penetrated her vagina without her consent.  Former Care One Deputy General Counsel intervened before K.K. contacted the Prosecutor's office and Defendant Daniel E. Straus authorized a "hush money" payment in exchange for a confidential settlement.

- Between 2020 through 2022, in one of the most egregious and depraved acts of sexual abuse committed by Defendant Daniel E. Straus, Defendant Daniel E. Straus coerced and engaged in several acts of non-

consensual sex with his former Executive Assistant, Plaintiff Meagan LaDue, who suffered from an addiction disability/handicap of alcoholism and was in treatment for same at all times relevant with Defendant Daniel E. Straus' awareness. The facts concerning Plaintiff LaDue's sexual trafficking, sexual harassment, and exploitation of Plaintiff LaDue's addiction/handicap are detailed in significant length below in this Complaint.

- In September 2021 through September 2022, a former male employee JT complained to Care One supervisor, Sharon Ziegler, that Defendant Daniel E. Straus' girlfriend, Defendant Vazquez, had been sexually harassing him in the workplace. Upon information and belief from discovery referenced in the publicly filed Carrona lawsuit, Defendant Vazquez sent JT numerous videos and photos of herself naked and also engaging in sexual acts to him.

- In or around 2023, Care One employee L.R. complained that her supervisor, Defendant Vazquez, forced her to have sex with her inside of her personal home and Defendant Vazquez bragged about the same to others at Care One, which was the subject of discovery in the Carrona lawsuit.

- In March 2024, employee J.M. complained to Plaintiff Elizabeth Straus that his supervisor, Defendant Vazquez, sexually harassed him by sexually touching his leg repeatedly under the conference room table during a work meeting. Plaintiff Elizabeth Straus reported the misconduct to Defendant Daniel E. Straus who took no curative action and dismissed it as "gossip" which is in writing.

- Plaintiffs possess ample evidence of numerous other Care One employees who were similarly coerced into sexual acts with Defendant Vazquez, who used her position of authority to offer career advancement in exchange for sex. Several Care One employees later reported being shown nude or graphic videos by Defendant Vazquez as part of her ongoing grooming method—all which was with Defendant Daniel E. Straus' encouragement, aiding and abetting;

- Defendants Straus and Vazquez transported Plaintiffs Straus and LaDue, and possibly other female employees, across state lines from New York, New Jersey, and Massachusetts for purposes of sex achieved through means of coercion and enticement tied to promises of career advancement and financial compensation to maintain and/or advance their jobs at Defendant Care One.

- Defendant Vazquez also used Defendant Partners Pharmacy, LLC, owned by Defendant Daniel E. Straus, to procure prescription drugs for their personal use utilizing, amongst others, Defendant Bridgecare.

- Furthermore, upon information and belief, Defendant Vazquez stole thousands of narcotics from a Care One facility located in Newton, Massachusetts, for her personal use. **(See "Ex. B" attached hereto, Anonymous Letter dated June 14, 2022 sent to all Newton Care One employees).**

- Defendants Straus, Vazquez, and Care One's conduct constitutes sexual trafficking under 18 U.S.C. § 1591, and § 1595, and also forms part of the pattern of racketeering activity under RICO. The use of fraud, coercion, financial control, corporate structure, and psychological abuse to force Plaintiff Straus into sex with her father's girlfriend, Defendant Vazquez, under threat of losing her livelihood and safety.

**Defendants' Healthcare Fraud Scheme and Whistleblower Retaliation**

- Defendant Care One is the second largest healthcare operator providing senior living, skilled nursing, rehabilitation, hospice, and other related services in New Jersey. However, compliance with Medicare and Medicaid's reimbursement programs and strict regulated guidelines was not taken seriously by Defendants Straus and Vazquez, with Defendant Vazquez acting unofficially as Care One's Chief Compliance Officer ("CCO") in addition to various other roles approved by Defendant Daniel E. Straus;

- Defendants, acting through its owner/founder Defendant Daniel E. Straus and his executives, routinely engaged in practices such as offering unlawful inducements and remuneration for Medicare patient referrals, inflating or misrepresenting services in Medicare billing, and otherwise bending strict Medicare rules to maximize Medicare revenue. Employees who raised concerns about illegal or ethical violations were

typically ostracized or terminated, creating a climate of fear that discouraged reporting of wrongdoing;

- Between 2012-2020, public records reveal that Defendants Straus and Care One were investigated by the U.S. Department of Justice and the U.S. Attorney's Office of New Jersey for illegally inducing referrals, bribery, and kickbacks for Medicare referrals and *quid pro quo* pressuring of Care One physicians in order to increase Medicare volume.

- Having not learned his lesson and escaped with a minor penalty settlement, Defendant Daniel E. Straus continued with the Medicare fraud and kickback schemes. Internal Care One emails in late 2023 and early 2024 showed Defendants' illegally offering and/or distributing expensive courtside tickets to New York Knicks basketball games and premier seats for New York Giants football games to physicians, hospital case managers, and other referral sources, in order to solicit and induce Medicare referrals. Defendant Daniel E. Straus personally sent text messages referencing Medicare referrals in exchange for remuneration; **(See "Ex. C" attached hereto)**

- While treating patients, Plaintiff Dr. Howard objected to and identified multiple instances of improper Medicare billing practices at Care One facilities. Dr. Howard observed that patient medical charts often lacked required documentation, yet Care One or its affiliates still fraudulently and illegally billed Medicare for the related services, including for services not rendered;

- Plaintiff Straus noted cases where wound care treatments were illegally billed even though there were no corresponding examination notes or wound measurements recorded, and Plaintiff Straus reported the same to Defendants Vazquez and Straus with a colleague whose identity will be disclosed during discovery;

- In March 2024, Plaintiff Dr. Howard reported to Defendant Vazquez and other supervisors that Care One's referral incentives of pressuring physicians to refer Medicare patients if they were seeing patients in the buildings, bonus paying staff to dis-enroll patients inappropriately at the expense of the patient, and Defendants' illegal attempt to steer patients from Dr. Howard's outside private practice with Hackensack University Medical Center without knowledge or oversight so that Defendant Bridge Care could unlawfully generate revenue in exchange for Dr. Howard's director fee he

was being paid and free nurse practitioner staffing for referrals) were illegal, and that the pattern of missing documentation and continued billing was potentially fraudulent;

- Plaintiff Dr. Howard repeatedly objected and explicitly disclosed to Defendants that these practices violated federal law, including the Anti-Kickback Statute and Stark Law, and Medicare regulations. Plaintiff Dr. Howard urged Defendants to cease such practices and to ensure accurate medical record-keeping for honest billing. Defendant Vazquez, with Defendant Daniel E. Straus' knowledge and encouragement, did nothing to eradicate these unlawful practices. Both Plaintiff Straus and Dr. Howard were fired in whistleblower retaliation for the same.

## Defendants' Racketeering Conspiracy

- For several years, Defendants Daniel Straus and Vazquez abused, threatened, and coerced women and others around Defendant Daniel Straus to fulfill his sexual desires, protect his reputation, and conceal his conduct. To do so, Defendant Daniel E. Straus relied on the employees, resources, and influence of the multi-faceted business empire of Care One that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, healthcare fraud, Medicare/Medicaid fraud, sex trafficking, and obstruction of justice;

- At all times relevant to this Complaint, Defendants engaged in a persistent and pervasive pattern of abuse toward women and other individuals. This abuse was, at times, verbal, emotional, physical, and sexual. As part of his pattern of abuse, Defendant Vazquez manipulated both male and female employees of the Care One enterprise to participate in highly orchestrated performances of sexual activity. At times, Defendant Daniel Straus and others acting at his direction, frequently made arrangements for women to travel to the enterprise-owned residences and corporate headquarters to engage in non-consensual sexual acts. Defendant Daniel E. Straus ensured participation from some of these women by, among other things, obtaining and distributing narcotics and alcohol to them, controlling their careers, leveraging his financial support, and threatening to cut off the same, and using intimidation and threats;

- Defendants Daniel E. Straus and Vazquez used the Care One enterprise, including certain employees, to carry out, facilitate, and cover up Defendant Daniel E. Straus'

abuse and commercial sex. Those employees including Defendant Daniel E. Straus' security staff, private investigators, lawyers, household staff, personal assistants, high-ranking supervisors and other close associates/affiliates of the Care One enterprise.

## II.    NATURE OF ACTION, JURISDICTION, AND VENUE

1.    This is an action seeking equitable and legal relief for violations of the: (1) Civil Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (Conducting an Enterprise); (2) Civil RICO, 18 U.S.C. § 1962(d) (Conspiracy); (3) Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595; (4) New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq.; (5) New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq. (Aiding and Abetting); (6) New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. (Discrimination); (7) New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. (Retaliation); (8) New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. (Sexual Harassment - Hostile Work Environment); (9) New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. (Aiding and Abetting); (10) Breach of Fiduciary Duty; (11) Breach of Contract; (12) Unjust Enrichment/ Quantum Meruit; (13) Intentional Infliction of Emotional Distress; (14) Civil Conspiracy; (15) Tortious Interference with Prospective Economic Advantage; and (16) Invasion of Privacy/ Intrusion Upon Seclusion.

2.    This Court has jurisdiction pursuant to 18 U.S.C. § 1961-1964(c) and 18 U.S.C. §1595, as this action arises under Federal statutes including RICO and TVPRA, as well as 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.    Venue is proper in the District of New Jersey under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in New Jersey, Plaintiff Straus resides in New Jersey, and Defendants reside and/or conduct business in this district with corporate headquarters in Fort Lee, New Jersey.

4.    Pursuant to the foregoing, Plaintiffs hereby request that the Court assert its jurisdiction over this matter.

### III. <u>PARTIES</u>

5.  Plaintiff, Elizabeth S. Straus, is a resident of New Jersey, and was formerly employed as Executive Vice President at Care One, LLC and its affiliated and related companies.  Plaintiff is the daughter of Defendant Daniel E. Straus. Until mid-2024, Elizabeth was a high-level executive, and fiduciary within the Care One enterprise of companies. She worked in various leadership capacities at Care One and affiliated companies for years and was deeply involved in the operations of the family business. Plaintiff Straus was terminated and constructively forced to separate from the company in 2024 under the circumstances described herein. At all relevant times, Plaintiff Straus is a beneficiary of certain Trusts and corporate arrangements that own parts of the Care One enterprise, managed by Defendant Daniel E. Straus.

6.  At all times pertinent to this Complaint, Plaintiff Straus was an employee of Defendant Care One, albeit intentionally misclassified as an "independent contractor" by Defendant Daniel E. Straus and worked primarily, if not entirely, at Care One's facilities office located throughout New Jersey, within the meaning of the New Jersey's Conscientious Employee Protection Act ("CEPA") pursuant to <u>N.J.S.A.</u> 34:19-1 *et seq.*

7.  Plaintiff, Dr. Brandon Howard, is a resident of New Jersey. Dr. Howard is an extremely accomplished board-certified physician who, at relevant times, provided medical services to patients at Defendants' skilled nursing and rehabilitation facilities. During his 15-year tenure with Hackensack University Medical Center, he was the largest independent Hospitalist in the Hackensack Meridian Hospital system—the largest hospital system in New Jersey. In early 2024, Dr. Howard entered into an independent contractor arrangement with Defendants to serve as a physician/Senior Medical Director at Care One facilities. He was jointly employed and/or contracted by the Care One Defendants, working closely with Care One's management, until his retaliatory termination on or about May 10, 2024.

8.  Plaintiff, Meagan LaDue, is Defendant Daniel E. Straus' former Executive Assistant from 2020 to April 30, 2022 and is one of the victims, including Plaintiff Straus, of violations of the Trafficking Victims Protection Act ("TVPA"), reauthorized as the

Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595.

9.  Defendant, Daniel E. Straus, is an individual residing, upon information and belief, in New Jersey and New York. Defendant Daniel E. Straus was at all times relevant to the founder, majority owner and Chief Executive Officer ("CEO"), Chairman and sole managing member of Care One, LLC, Care One's network of healthcare facilities, and its affiliated companies.

10. During the relevant time period, Defendants Straus and Vazquez were Plaintiff Elizabeth Straus and Plaintiff Dr. Howard's supervisor and/or had supervisory control, power and authority over Plaintiffs and controlled Defendants' workplace, who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of his employment at the workplace site during working hours, or, to the extent they went beyond the scope of their employment, Defendant Daniel E. Straus ratified, embraced, and aided the illegal alleged conduct by Defendants.

11. As CEO and Chairman of Care One, Defendant Daniel E. Straus was a senior management employee who controlled Plaintiffs' workplace and supervised Plaintiffs, and (1) aided the employer in performing a wrongful act that caused an injury; and (2) was generally aware of his role as part of the illegal or tortious conduct.

12. Defendant Emily Vazquez is an individual residing in New Jersey. At all relevant times, Vazquez was employed by Care One in a senior management capacity (including as Vice President of Special Operations) and acted as a trusted agent of Defendant Daniel E. Straus, and in a sexual relationship with Defendant Daniel E. Straus that she has often shared with her peers and subordinates. Vazquez had supervisory authority over Plaintiffs Dr. Howard and Straus as a fellow executive.

13. Defendants Care One LLC and Care Realty LLC, is a New Jersey-based healthcare operator controlling close to seventy (70) facilities, including subacute, nursing, assisted living, hospice, nurse practitioner company, homecare, and institutional pharmacy, and is central and inextricably intertwined to the fraud and retaliation alleged herein.

14. Defendant Care One is a senior-care provider operating nursing homes and assisted living facilities in the Northern United States that received federal and state funds through Medicare, Medicaid, commercial insurance and Federal Emergency Management Agency ("FEMA"), COVID funds through the New Jersey Department of Health, with its principal place of business located at 173 Bridge Plaza North, Fort Lee, New Jersey, Bergen County.

15. Defendants Care One Management, LLC, and Care Services, LLC, are limited liability companies organized under the laws of New Jersey with its principal office in New Jersey. Care One Management, LLC, managed and provided centralized administrative services for the various Care One facilities. It acted as an agent and alter ego of the Care One facilities and of Daniel E. Straus in carrying out the wrongful acts alleged herein.

16. Defendant Ascend Healthcare, including its affiliated entities Ascend Health, LLC and Care Alternatives, Inc. d/b/a Ascend Hospice (collectively, "Ascend"), is a healthcare business providing hospice, palliative, and home health services, and is affiliated with Care One. Upon information and belief, Ascend is owned or controlled by Defendant Daniel E. Straus and works in tandem with Care One facilities to coordinate patient care, hospice care and referrals. Ascend participated in the healthcare fraud misconduct alleged herein to the extent that Care One's fraudulent schemes and retaliatory actions extended into hospice and home care operations.

17. Defendant BridgeCare LLC, upon information and belief, is a business entity operating within Care One's integrated network, and is an affiliate controlled by Defendant Daniel E. Straus that provides or coordinates ancillary healthcare staffing and services. BridgeCare LLC, is the nurse practitioner program referenced in this Complaint. BridgeCare LLC was utilized by Defendants to recruit and employ medical staff, such as nurse practitioners, as part of their plan to appropriate Plaintiff Dr. Howard's practice and network of patients in order to induce referrals from physicians. BridgeCare LLC's actions and knowledge are attributable to the other Defendants and inextricably intertwined as part of a common enterprise. This entity is affiliated with and controlled by Care One and

Defendant Daniel E. Straus and were used to facilitate illegal billing and concealment schemes.

18.    During the relevant time period, JOHN DOES 1-10 are currently unknown employees who were either senior management level employees who controlled Plaintiff's workplace, and supervised plaintiff and aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment at the workplace during working hours, or, to the extent they went beyond the scope of their employment, defendants ratified, embraced and added to his conduct.  As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

19.    During the relevant time period, XYZ Corps. 1-10 are unknown affiliated corporations or entities or other corporations who have liability for the claims set forth herein.  As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual entities by name.

20.    Thus, all Defendants are subject to suit under the statutes alleged above.

## IV. <u>FACTUAL ALLEGATIONS</u>

21.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above, with the same force and effect as if fully set forth herein.

### a. Plaintiff Elizabeth Straus' Background & Employment History with Defendants

22.    Plaintiff Straus is an experienced and well-recognized healthcare executive, including 2019 Healthcare professional of the Year, McKnight's Hall of Honor Women of Distinction Award, and Top Leading Women Intrapreneur Award.

23.    In or about 2008, Plaintiff Straus first joined her father's company, Defendant Care One after graduating with honors from New York University ("NYU)".

24.    Plaintiff Straus was ultimately promoted to the roles of Executive Vice President ("EVP") and Chief Operating Officer ("COO") until she was initially terminated in September 2021.

25.    While at Care One and its affiliates between 2008 and September 2021, Plaintiff Straus directed operational and financial management of a $3 billion enterprise,

encompassing over 65 facilities across several states. She led over 15,000 employees and oversaw over $350 million in construction and renovation projects. She also secured funding for multimillion-dollar initiatives, and expanded Care One's portfolio nationally.

26.    By 2021, her salary was $1,000,000 per year, with a $1,000,000 bonus, totaling 2M per year in compensation.

27.    During her 2008 to 2021 tenure, Plaintiff Straus was at all times an exceptional employee who received outstanding employee reviews, increased responsibilities and hundreds of text message praise by her father, Defendant and CEO Daniel Straus, regarding her performance and improvement of the company.

28.    However, Plaintiff Straus was constructively terminated in September 2021 in direct response in part to her and a colleague's actions in honorably returning a $90 million dollar "PPP" loan that Care One wrongfully received during the earlier part of the pandemic.

29.    This loan was the subject of Defendant Daniel E. Straus' intense pressure towards Care One's finance department to fraudulently apply for this loan.

30.    In addition, in September of 2021, Plaintiff Straus adamantly objected to her father, CEO Defendant Daniel E. Straus, on his refusal to reconcile tens of millions of dollars of Medicare COVID funds to avoid "double-dipping" into Medicare funds from the government stemming from five (5) license agreements between the New Jersey Dept. of Health and Care One. Defendant Daniel E. Straus refused and had no desire to reconcile the COVID payments and return the resulting overpayments. **(See "Ex. D" attached hereto, copies of Care One and federal license agreements)**

31.    Inclusive of these events and her refusal/objection to engage in participating in this illegal conduct, Plaintiff Straus was constructively terminated from her 2 million dollar per year salaried position as Executive Vice President with Defendant Care One in September 2021.

32.    As a direct consequence, for the next couple of years Defendant Daniel E. Straus continued to retaliate and inflict upon Plaintiff severe emotional distress and anguish treating Plaintiff like a pariah in the family for his belief that she "betrayed"

the family as a result of her ethical actions concerning her insistence on compliance.

33. For the next two years, Plaintiff Straus and her father, Defendant Daniel Straus, had an extremely strained relationship.

34. By 2023, Care One's performance and quality had deteriorated significantly following Plaintiff Straus' two-year absence and wrongful termination from the company.

35. However, because Care One was near financial collapse. Defendant Daniel Straus pressured Plaintiff Straus to return to her prior role in turning the company around in September 2023.

36. At her father's insistence, in September 2023, Plaintiff Straus returned back to Care One in a full-time capacity and resumed her role and duties as Executive Vice President.

37. Although Defendants never provided Plaintiff with a new letter of employment or W-2 forms, Plaintiff Straus believed at all times that her father returned her back to her Executive Vice President role.

38. Between September 2023 and April 11, 2024, Plaintiff Straus resumed her usual duties of Executive Vice President and worked long hours to improve the company's quality of care and increase monthly revenue through high-quality clinical programs, recruitment of new and old quality employees, and retention of quality-focused physicians.

39. Plaintiff Straus also set up a team and certain programs focused on becoming a step-down hospital environment with a multi-disciplinary approach to the levels of acute care needed in the buildings.  It was a "patient focused" approach to care at all levels and created programs to avoid readmissions to the hospital and worked with the physicians and hospitals to target improvements in quality care metrics.

40. Defendant Daniel Straus was highly impressed with Plaintiff Straus' work and in March 2024, he told Plaintiff that her performance was "incredible," including thanking her because Care One had "turned the corner" and had made "enormous progress." (**See "Ex. E" attached hereto**)

41.  During this time, however, Plaintiff received a net salary of just over $2,000 per month, earning less than $30,000 per year.

42.  This new "salary" ordered by Defendants Daniel E. Straus and Care One was significantly below what she was entitled to and only a fraction of her $2 million dollar per year compensation that Plaintiff Straus was earning in 2021.

43.  Remarkably, Defendant Daniel Straus justified this by illegally using Plaintiff's family Trust to pay her employment salary, rather than adding Plaintiff to Care One's official payroll, thereby avoiding payroll taxes.

44.  However, during this employment period at issue, Defendants Daniel E. Straus and Vazquez engaged in a pattern of sexual harassment, *quid pro quo* harassment, threats, coercion, stalking, harassment and sex trafficking using the Care One enterprise to assert control over her.

45.  Plaintiff Straus was exposed to her father's many female employees whom he was openly involved in inappropriate relationships with and often came over to her home to babysit, and even picked her up from day camp. This has been part of a pervasive pattern and culture of sexual misconduct and sex trafficking that Plaintiff Straus has been surrounded by working under the submission of her father at care one over a span of nearly fifteen (15) years.

46.  During Plaintiff Elizabeth Straus' employment with Care One, Defendant Daniel E. Straus' girlfriend, Senior Executive Vice President of Care One and Director of Special Projects, Defendant Emily Vazquez, frequently engaged in sexually inappropriate conduct by touching Plaintiff Straus in a sexual manner, making inappropriate sexual comments and flirtations about how nice her breasts and body looked, frequently making sexually inappropriate jokes, and frequently making overt sexual advances towards her inside and outside the presence of Plaintiff Straus' father, who desired to have a "threesome" with Plaintiff and her father, Defendant Daniel E. Straus.

47.  Defendant Vazquez would regularly show Plaintiff Straus both in and outside the workplace at Care One sexually graphic videos of herself engaged in sexual acts with other men and women—including footage she claimed had been shown to Defendant Daniel E. Straus for his sexual gratification.

18

48.     On more than one occasion between January and April 11, 2024, Defendant Vazquez showed up unannounced at Plaintiff Straus' apartment at night in New York City under the guise of discussing a work matter. Upon entry into Plaintiff Straus' home, Defendant Vazquez propositioned Plaintiff Straus to have sex with her in Plaintiff Straus' apartment or go into Defendant Vazquez's car that was waiting outside the apartment. Plaintiff Straus declined Defendant Vazquez's sexual advances, as she has had to do on numerous occasions both in and outside the workplace. Defendant Vazquez would not take no for an answer and continued to coerce Plaintiff Straus into engaging in sexual intercourse or other sexual acts with Defendant Vazquez under the promise that Plaintiff Straus's previous annual salary of $1 million, which she was earning prior to her 2021 constructive termination, would be restored.

49.     As a Senior Executive and the Madame of Defendant Daniel E. Straus, Defendant Vazquez was well aware that Plaintiff Straus was earning less than $30,000 per year, an extreme decrease from her previous salary due to Defendant Straus' wrongful withholding of payroll earnings and used the promise of payment to entice Plaintiff Straus to engage in unwanted sexual activity.

50.     Defendant Vazquez went so far as to state to Plaintiff Straus in a *quid pro quo* manner that if Plaintiff Straus not only had sex with her but had sex with her in the presence of Plaintiff Straus' father, Defendant Daniel E. Straus, it would "please her father" and he would then reevaluate Plaintiff Straus' $30,000 salary.

51.     Defendants Daniel E. Straus and Vazquez placed Plaintiff Straus in an impossible position between her father's coercion, her personal financial survival tied to Plaintiff Straus' financial Trust controlled by her father, and Defendant Vazquez's abusive control of her day-to-day role in Care One.

52.     As Plaintiff Straus' superior, Defendant Vazquez knowingly used this information to psychologically break Plaintiff Straus down to coerce her to engage in sexual acts in violation of the TVPRA.

53.     Defendants Vazquez and Daniel E. Straus used the Care One business to exert control over Plaintiff Straus' career and personal life in all respects causing her to be transported to and from New York City and New Jersey daily to maintain her

job. Defendants perpetrated sex trafficking of Plaintiff Straus by soliciting and attempting to coerce her to engage in unwanted sexual acts in multiple jurisdictions, and all Defendants and the Care One venture profited and benefitted from keeping Plaintiff silenced on these issues.

54.    Defendant Vazquez orchestrated a culture and sexual playground by the Care One enterprise that targeted vulnerable subordinate female and male employees in various jurisdictions, including but not limited to, Massachusetts and New Jersey and other Care One locations for grooming, sexual exploitation, and forced sexual submission under threats of professional retaliation, termination, and/or public humiliation. Defendant Vazquez cultivated a toxic work environment where sexual favors were openly traded for promotion, access, career security—all done at Co-Defendant Daniel E. Straus' aiding, abetting and approval.

55.    Defendants Vazquez and Daniel E. Straus have a exhibited a pattern and practice of using Care One as a criminal enterprise for sexual abuse, harassment, retaliation, trafficking, and exploitation as evidenced by numerous lawsuits and claims filed against them asserting such allegations, such as: <u>Kim Velez v. Care One, LLC, Daniel Straus and Sen. Robert Torricelli, et al</u>, BER-L-4758-06<u>; Care One, LLC, v. William G. Burris Jr., et al</u>, BER-C-158-09; <u>Christina Carrona v. Care One Management, LLC, and Emily Vazquez</u>, MON-L-1139-23; <u>Blalock v. Partners Pharmacy, LLC</u>, 2:23-cv-03814. **(See Ex. A")**

56.    The Defendants' acts and omissions, taken separately and/or together as outlined, constitute a violation of the TVPRA, 18 U.S.C. §§ 1591, 1595 against Plaintiff Straus.

   **b. Defendant Daniel Straus Hires and Lures Plaintiff Meagan LaDue into a Relationship and Exerted Total Control of her Career and Personal Life.**

57.    Plaintiff LaDue was first introduced to Daniel E. Straus when she came in for an interview for the position of Executive Assistant ("EA") to Daniel E. Straus at Care One's Fort Lee, New Jersey, corporate headquarters.

58.    On December 23, 2019, Plaintiff LaDue was hired and accepted the position as Executive Assistant to Daniel E. Straus.

59.    At the time of her interview and after accepting the job offer, Plaintiff LaDue resided in New York City and had no intention of relocating to New Jersey or elsewhere for her job with Care One.

60.    In early February 2020, Defendant Daniel E. Straus invited her out to dinner in New York City just the two of them.

61.    Plaintiff LaDue thought it was odd that Defendant Daniel E. Straus invited her to dinner considering it was in New York City, away from the office, the invitation was well after work hours, and clearly had nothing to do with work related tasks.

62.    However, Plaintiff LaDue feared that if she said no it could lead to her termination or place in her bad standing with Defendants.

63.    During the course of the dinner, Defendant Daniel E. Straus placed his hands on Plaintiff's leg and began rubbing and touching her hands which made Plaintiff feel extremely uncomfortable.

64.    Plaintiff LaDue was afraid to push his hands away and tell him to stop rubbing her legs in fear of his reaction.

65.    During the course of the dinner, Defendant Daniel E. Straus proceeded to ask Plaintiff numerous personal questions about her love life, relationship status, break up history, and deep questions about her family history (e.g. hardships, struggles, her family's poor finances, her father's lack of career, etc.).

66.    During dinner, Plaintiff LaDue told Defendant Daniel E. Straus information about her struggles with alcoholism, that alcoholism ran in her family, and that she was sober by several months and needed to be strong to maintain it.

67.    Remarkably, Defendant Daniel E. Straus offered Plaintiff LaDue an increase in salary with no new responsibilities as he kept touching and caressing her legs and hands at dinner even though she was only employed at Care One for two shorts months at this time.

68.    Plaintiff LaDue knew Defendant Daniel E. Straus was trying to manipulate her by offering her a higher salary while touching her at the same time.

69.    Defendant Daniel E. Straus was clearly exerting his power and influence over Plaintiff LaDue at all times and from the inception of this dinner "date" he required.

70. This dynamic was fueled by their twenty-five (25) year age gap as well as their relative positions in the industry—with Defendant Daniel E. Straus considered a healthcare "mogul" and Plaintiff at the very start of her career as his subordinate EA.

71. During the dinner and after learning these facts, Defendant Daniel E. Straus ordered a bottle of red wine and Plaintiff LaDue began to feel pressured to drink.

72. Plaintiff LaDue knew that if she went along with him touching her, answering his intrusive personal questions, and drinking wine with him, then he would fulfill what he said about promising her a higher salary so quickly after the dinner.

73. Plaintiff drank wine that night and broke her sobriety to please Defendant Daniel E. Straus.

74. In telling Plaintiff LaDue about the promotion as he continued to touch her, Defendant Daniel E. Straus specified to Plaintiff that he required her to directly report to him only with no intermediary or "go between" on all of their communications going forward.

75. After dinner that night, Defendant Daniel E. Straus kissed/attempted to kiss Plaintiff LaDue twice near her mouth, but Plaintiff resisted from allowing him to fully kiss her mouth.

76. Two weeks after their dinner, in March 2020 while inside Defendant Daniel E. Straus' office within Care One's headquarters, Defendant pulled out a bottle of white wine with two glasses for him and Plaintiff LaDue.

77. Defendant Daniel E. Straus deliberately asked Plaintiff LaDue to drink with him knowing very well she was in recovery and her history with alcoholism, and made subliminal comments like, "Please don't make me drink alone".

78. Feeling pressured, Plaintiff drank wine with Defendant Daniel E. Straus in his office and quickly became altered and impaired.

79. After a few glasses of wine, Defendant Daniel E. Straus sat next to Plaintiff on his office couch and then began touching and kissing Plaintiff. He then forcibly positioned Plaintiff's head in a manner to give him oral sex.

80. From that day in March 2020 until the time of Plaintiff LaDue's constructive discharge on April 30, 2022, Defendant Daniel E. Straus knew how to manipulate

and coerce Plaintiff LaDue for his sexual gratification and knew alcohol was the key.

81.  Within just a few months of her employment and having received her salary increase, Defendant Daniel E. Straus pressured Plaintiff LaDue to move from New York City to New Jersey to be closer to him.

82.  Defendant Daniel E. Straus frequently stated to Plaintiff LaDue how much "nicer" her life would be if she listened to him and moved out of her small apartment in New York City and upgraded across state lines to an apartment in Fort Lee, New Jersey.

83.  Plaintiff LaDue refused his request to move across state lines numerous times, telling him that she was happy with her life and her apartment in New York City.

84.  However, Defendant Daniel E. Straus kept persisting and pushing the issue of her moving to in New Jersey, causing Plaintiff LaDue to give into this demand as well.

85.  Once Plaintiff LaDue finally agreed to this move, Defendant Daniel E. Straus offered to give her a paid-for company car.

86.  Fearing retaliation if she refused and didn't accept his persistent offers and demands, in March of 2021, at Defendant Daniel E. Straus' insistence, Plaintiff LaDue moved into an apartment in Fort Lee, New Jersey.

87.  Defendant Daniel E. Straus furnished most of the apartment with high-end furniture paid for by the Company. This was another "perk" he referred to that he was giving her.

88.  From that point forward, Defendant Daniel E. Straus frequently insisted that Plaintiff LaDue come with him to various restaurants for dinner and drinks, including but not limited to, The River Palm, in Edgewater, NJ and the Ventanas, in Fort Lee, NJ where he would often her drunk and then become sexually aggressive, touching her legs, kissing her and making sexually explicit comments.

89.  The job, the car, and housing arrangement were presented as benefits that he would often remind Plaintiff of, praising himself and commenting on how nice he was to be affording Plaintiff the Company car to drive, as well as frequently implying his expectation of sexual favors in return.  These "perks", as he referred

to them, quickly became tools of coercion and control by Defendant Daniel E. Straus.

90.  Recognizing the means and manner how to take advantage of Plaintiff, Defendant Daniel E. Straus would regularly pressure Plaintiff LaDue to drink alcohol in the office during work hours against her will.

91.  Plaintiff LaDue told Defendant Daniel E. Straus over and over again that she cannot drink and to stop asking her to drink with him.

92.  Defendant Daniel E. Straus seemed to take Plaintiff LaDue's comments as a game in which nights after work he could get her to drink with him and sexually coerce her.

93.  Defendant Daniel E. Straus knew that Plaintiff LaDue was in AA for treatment and help with alcohol trying to maintain sobriety.

94.  Defendant Daniel E. Straus also knew her father was an alcoholic and that her condition was hereditary.

95.  Defendant Daniel E. Straus was at all times very, very aware of Plaintiff's addiction because she was open to him and others about her addiction/handicap/disability.

96.  On numerous occasions forward, Defendant Daniel E. Straus used alcohol to coerce and lower Plaintiff LaDue's resistance and pressured her into unwanted sexual acts that occurred both inside the Fort Lee corporate headquarters, and outside of it.

97.  Plaintiff LaDue feared retaliation to refuse Defendant Daniel E. Straus' sexual advances and his pressure over her to drink alcohol with him.

98.  Approximately 85% of the time, Plaintiff LaDue and Defendant Daniel E. Straus had sex inside of Defendant Daniel E. Straus' office in the Fort Lee, New Jersey headquarters, because that's where he wanted it and felt a power trip being able to do whatever he wanted to and wherever he wanted to.

99.  At this point, Defendant Daniel E. Straus had **absolute, unequivocal control over Plaintiff LaDue's income, housing, transportation and professional future**.

100.  Plaintiff LaDue's job as Defendant Daniel E. Straus' Executive Assistant started to become a downward spiral of prioritizing Defendant Daniel E. Straus' personal sexual desires over work.

101.  Plaintiff LaDue's life became a vast departure from the job that she had been hired to do and gave up her home in New York City for.

102.  Defendant Daniel E. Straus' expectation was that Plaintiff LaDue was to welcome his sexual advances routinely, and drinking with him became a nearly daily work routine.

103.  Plaintiff became isolated within Defendant Daniel E. Straus' business enterprise and afraid to speak out and complain out of fear of losing her job, home, car, as well as shame and embarrassment.

104.  Defendant Daniel E. Straus was the cause of Plaintiff LaDue's relapse of alcoholism. Defendant Daniel E. Straus was destroying her life, her health, and her wellbeing.

105.  Unfortunately, there was no one for Plaintiff LaDue to safely confide and complain to at Care One because every single person in the Care One multi-billion-dollar enterprise was subordinate to Defendant Daniel E. Straus.

106.  Plaintiff LaDue was made to feel that her job depended on her sexual availability to him inside and outside the office with alcohol going hand-in-hand.

107.  In or around March 2021, to continue his sexual control over Plaintiff and the *quid pro quo* silent nature of their relationship, Defendant Daniel E. Straus coerced Plaintiff LaDue with a new furnished luxury apartment in Teaneck, New Jersey owned by him and the Care One enterprise.

108.  Defendant Daniel E. Straus would regularly remind her about what he was giving her and how "amazing a person he was" and made clear that it would be crazy for her to deny him these sexual pleasures.

109.  Around this time, Plaintiff LaDue began experiencing depression and anxiety. Her weight slowly declined in reaction to the stress of the situation that she was now trapped in by a man who essentially "owned" her.

110.  In July 2021, Plaintiff LaDue requested a leave of absence to attend a drug and alcohol rehabilitation center in Westchester, New York for a little over a month's time. During rehab treatment, Plaintiff LaDue became very anxious and agitated by the lack of empathy and sympathy Defendant Daniel E. Straus showed for her health and well-being. She struggled with an increasing amount of depression and

anxiety out of fear of what would happen when she returned and if she would continue to feel coerced to drink alcohol and perform nonconsensual sexual acts at work.

111.    Notably, Defendant Daniel E. Straus approved the rehab treatment and was paid for by Care One LLC. However, this felt like a strategic move on Defendant Daniel E. Straus' part so he could exert control over Plaintiff LaDue's rehab treatment, potentially access her health care records there, and keep her isolated in a remote location in the event she was to open her mouth and expose Defendant Daniel E. Straus for how he sexually manipulated and harassed her.

112.    While at rehab, the trauma from the sexual abuse of Defendant Daniel E. Straus was so bad that Plaintiff LaDue was administered shock therapy.

113.    After returning from rehab, Plaintiff LaDue confided in a Care One colleague about Defendant Daniel E. Straus' sexual abuse, moving her into his apartment at 1500 Teaneck Road, and that she was terrified that the sexual abuse would continue as majority of the sexual abuse occurred in his corporate office in Fort Lee, NJ.

114.    It was Defendant Daniel E. Straus' expectation that Plaintiff LaDue was to be silent and not to discuss his conduct with anyone.  He would instruct her to arrive to where they were meeting before he arrived to not let anyone become aware that they were meeting, and she was not permitted to leave till after he left in order to facilitate the abusive relationship that Defendant Daniel E. Straus was having with her.

115.    In or around April 30, 2022, Plaintiff LaDue came to the point that she could no longer reasonably tolerate the workplace conditions, sexual harassment and abuse of alcohol at Care One.  She left her position that day and decided to relocate to California in order to get away from Defendant Daniel E. Straus as far as possible.

116.    During Plaintiff LaDue's time at Care One and Straus-affiliated companies, she became well aware of multiple other women who were promoted, retained, terminated or retaliated against based on their sexual relationship and status with Defendant Daniel E. Straus.

117. In particular, Plaintiff LaDue observed the rise of Defendant Emily Vazquez, who began to function as both a sexual partner to Defendant Daniel E. Straus and an enforcer of his companies in a high-level executive capacity.

118. The sexual trafficking Plaintiff LaDue suffered at the hands of Defendant Daniel E. Straus by means of enticement, coercion, threats, and manipulation was not an isolated incident, but rather part of a coordinated enterprise that used corporate power to exploit and silence women.

119. Upon information and belief, more than nineteen (19) female employees over the years have been subjected to unwelcome sexual conduct by Defendant Daniel E. Straus. Women who acquiesced to this conduct were often given promotions, pay raises, or other favoritism, while women who resisted or complained were marginalized, demoted, or fired. This pattern was well-known within the company and contributed to a pervasive hostile work environment.

120. Plaintiff Straus was also a vocal critic of the discriminatory and harassing behavior that had proliferated under Defendant Daniel E. Straus' leadership. She was well aware of her father's inappropriate relationships with female employees and the toxic effect this behavior had on company culture. On multiple occasions, Plaintiff Straus implored Defendant Daniel E. Straus to maintain professional boundaries and warned him that the culture of sexual favoritism and harassment was unacceptable and could lead to serious legal trouble. She advocated for proper human resources policies, training, and accountability measures to address the issue. These efforts, however, were not welcomed by Defendant Daniel E. Straus, who did not appreciate challenges to his personal conduct or his management style.

121. Defendants used the Care One business to exert control over Plaintiff LaDue's career and personal life in all respects causing her to be transported to and from New York City and New Jersey, and subsequent relocation to New Jersey to maintain her job. Defendants perpetrated sex trafficking of Plaintiff LaDue by soliciting and coerce her to engage in unwanted sexual acts in multiple jurisdictions, and all Defendants and the Care One venture profited and benefitted from keeping Plaintiff silenced on these issues.

122. Defendants Vazquez and Daniel E. Straus have a exhibited a pattern and practice of using Care One as a criminal enterprise for sexual abuse, harassment, retaliation, and exploitation as evidenced by numerous lawsuits and claims filed against them asserting such allegations, such as: <u>Kim Velez v. Care One, LLC, Daniel Straus and Sen. Robert Torricelli, et al</u>, BER-L-4758-06<u>; Care One, LLC, v. William G. Burris Jr., et al</u>, BER-C-158-09; <u>Christina Carrona v. Care One Management, LLC, and Emily Vazquez</u>, MON-L-1139-23; <u>Blalock v. Partners Pharmacy, LLC</u>, 2:23-cv-03814. **(See "Ex. A")**

123. The Defendants' acts and omissions, taken separately and/or together as outlined, constitute a violation of 18 U.S.C. § 1595 against Plaintiff LaDue.

### c. **Plaintiff Dr. Howard's Employment History with Defendant**

124. Plaintiff Dr. Howard started working for Care One in or around 2017 serving as Medical Director of one of many of Defendants' Bergen County buildings and worked diligently to improve patient care and outcomes through innovative programs.

125. In addition to his dedicated work with Defendant Care One from 2017 till March 2024, Plaintiff Dr. Howard served as the largest independent "Hospitalist" (i.e. General Practitioner) in the Hackensack Meridian Hospital system, which is the largest hospital system in New Jersey.

126. It cannot be disputed that Plaintiff Dr. Howard's reputation, accolades, and accomplishments in the field of medicine are exceptional by any standard.

127. In or around February 2024, Plaintiff Straus personally recruited Plaintiff Dr. Howard to take on a full-time position as "Senior Medical Director" across Care One's Bergen County portfolio of buildings.

128. Plaintiff Straus chose Plaintiff Dr. Howard for one reason only—to improve and elevate patient care and its standards at Care One facilities that were significantly declining.

129. Following her return to Care One in 2023, Plaintiff Straus strongly felt that Care One needed the right medical management and oversight to stand apart for its ability to care for patients in a short term and step-down hospital setting given the acuity of the patients that were now being discharged to nursing homes.

130.    In doing so, Plaintiff Straus attempted to elevate Care One's care delivery in the industry by creating a vertical integration of on-site medical care to lower readmissions to the hospitals, to improve patient outcomes and regulatory compliance at Care One's facilities.

131.    In order to integrate this program quickly, Defendant Vazquez assured Plaintiff Dr. Howard that if he was amenable to moving his team to Care One for a March 1, 2024 launch of this program, Care One would look to help offset the billing lag he would have with the quick transition.

132.    Defendant Vazquez told Plaintiff Dr. Howard that she / Care One would have Dr. Howard's first month's paycheck for the month of March 2024 for his services given to him after two weeks instead of the standard 30-day payment, and then every month subsequent would be per the normal contract terms of waiting 30 days for payment from the preceding month.

133.    Notably, Plaintiff Dr. Howard accepted this position under the promise that Care One would timely pay him for his services, which Defendants had previously failed to do so during his previous time working for Care One.

134.    When Plaintiff Straus returned to Care One in September 2023, she was made aware of a widespread issue where physicians were not getting paid in line with the medical contracts they had with the various Care One buildings.  Plaintiff Straus brought this to Defendants Straus and Vazquez's attention explaining the perception of the medical community and compliance issues. Plaintiff Straus began to address this issue with the individual physicians looking to repair the perception and breach of contract the Company seemingly had. However, Plaintiff Dr. Howard had not received his compensation in line with his contract for the building he was Medical Director to since 2018 for 18 months prior to Plaintiff's return to Care One.

**d. Defendants' Ongoing Actions of Healthcare Fraud and Conspiracy to Commit Medicare and Medicaid Fraud**

135.    Care One is the second largest healthcare operator providing senior living, skilled nursing, rehabilitation, hospice, and other related services in New Jersey, and one of the largest in the country. Under Defendant Daniel E. Straus's leadership, Care

One grew its business substantially, but this growth was accompanied by a corporate culture that prioritized profits at any cost, often skirting or violating federal and state laws designed to protect patients and employees.

136.     Compliance with legal requirements was treated as secondary within Care One's upper management. Upon information and belief, Defendants, acting through Defendant Daniel E. Straus and his executives, routinely engaged in practices such as offering unlawful inducements for patient referrals, inflating or misrepresenting services in Medicare billing, and otherwise bending rules to maximize revenue. Employees who raised concerns about legal or ethical violations were typically ostracized or terminated, creating a climate of fear that discouraged reporting of wrongdoing.

**e.**   **Defendants' Fraudulent Conduct During the COVID-19 Pandemic**

137.     On March 9, 2020, after the federal Center for Disease Control and Prevention ("CDC") determined that older adults had higher risk for severe health complications due to COVID and issued guidelines for older adults in retirement communities and independent facilities, New Jersey Governor Philip D. Murphy issued Executive Order No. 193 ("EO 103").

138.     EO 103 proclaimed a public health emergency and that a state of emergency existed in New Jersey. It also recognized the necessity to take action against this public health hazard to protest and maintain, as well, restore the health, safety, and welfare of New Jersey residents and visitors pursuant to N.J.S.A 26:13-1, et. seq. and N.J.S.A. App A:9-33 et seq., among other legal authorities.

139.     Pursuant to EO 103 and CDC guidelines, the DOH determined an emergent need to ensure long-term care residents who tested positive for COVID-19 would continue to receive the required medical care at long-term care facilities while balancing the safety for other residents or staff at risk of infection.

140.     Pursuant to EO 103 and CDC guidelines, the DOH responded to an emerging crisis at St. Joseph, a Catholic not-for-profit facility, that had been overtaken by COVID-19 and withering after experiencing a high employee turnover due to fears of contracting COVID-19. Patients were very ill, getting one meal per day, if at all,

and not receiving their medication. The facility was standing on its last leg with only three (3) remaining staff members, who were in their 80s and presumed to be COVID-19 positive.

141.  The DOH engaged with Care One to inquire whether the Defendants would be a viable long-term care facility to care for St. Joseph's patients.

142.  On April 1, 2020, Linda Martin, Care One's Chief Compliance Officer ("CCO"), emailed the DOH, providing the available occupancy per Care One facilities for potential care of COVID-19 patients. COO Ms. Martin also noted that based on the level of services needed, the total costs to take in COVID-19 patients would "far exceed" the normal costs of care.  As such, Ms. Martin proposed a statewide contract, outlining the appropriate financial arrangements to avoid violating the Stafford Act's prohibition of receiving a duplication of benefits from multiple sources, also known as "double dipping."  **(See "Ex. F", Martin's April 1, 2020 email to DOH)**

143.  Under this financial arrangement, DOH would make an upfront payment, similar to a loan, to Care One for future services provided to St. Joseph's patients. Repayment to DOH would be based on reimbursements Care One received from the Centers for Medicare & Medicaid Services (CMS) for services provided to St. Joseph's patients. Any outstanding balance for services provided to St. Joseph's patients would be pursued by DOH from the Federal Emergency Management Agency ("FEMA").

144.  DOH agreed to this financial arrangement, contingent upon an affidavit, placing the burden on Care One to prudently reconcile benefits received by DOH and CMS to ensure no duplication of benefits were made or kept.

145.  Shortly thereafter, Care One assumed the responsibility for the care of St. Joseph's patients, who were also presumed to be positive with COVID-19 as testing was not available during this time, and similar situated facilities.

146.  Care One received an initial $3,000,000 payment for future services to be rendered to the St. Joseph's patients.

147.  On April 16, 2020, the Defendants and the DOH entered into a License Agreement ("License"). The License deemed Defendant Care One's long-term care facilities

as suitable for the care and treatment of long-term care patients with COVID-19 illnesses, pursuant to EO 103. **(See Ex. D)**

148.    The License designated five (5) Care One facilities as "Licensed Premises," approved for the care, sheltering, and treatment of patients who have tested positive for COVID-19 and require long-term care outside of a hospital setting. Nursing homes located in New Jersey were required to send COVID-19 positive patients to one of the five Care One facilities when a need arose. **(Id.)**

149.    The License made the DOH responsible for the reasonable cost of all utilities, staff, and supplies for the Licensed Premises and, if necessary, any Additional Licensed Premises. As the costs were to protect public health and safety and to save lives, the costs paid by the DOH would be eligible for federal COVID-19 monies distributed by the FEMA. **(Id.)**

150.    Between July 2020 and July 2021, Care One's Licensed Premises cared for approximately 270,000 Medicare covered patients.

151.    Care One submitted claims to CMS for services provided during July 2020 - July 2021, to the 270,000 Medicare covered patients for reimbursement.

152.    CMS reimbursed Care One for all claims submitted for services rendered during July 2020 - July 2021 to the approximately 270,000 Medicare covered patients.

153.    Care One, pursuant to Defendant Daniel E. Straus' direction, invoiced the DOH for all services provided to the approximately 270,000 Medicare covered patients, all the operational costs incurred by the Licensed Premises, including labor and expense, between July 2020 and July 2021.

154.    In the Summer of 2021, Care One's then-General Counsel signed the Affidavit drafted by DOH.

155.    By late Summer of 2021, Defendant Daniel E. Straus, driven by his insatiable greed, became irate that the DOH had not reimbursed the claims submitted by Care One's Licensed Premises. Plaintiff Straus and Care One's then-General Counsel informed Defendant Daniel E. Straus that per the Affidavit, DOH and federal funds had to be reconciled to avoid double dipping.

156.    Care One was required to reconcile reimbursements received by the State and FEMA funds required reconciliation to ensure

157. From July 2020 to July 2021, Defendants **engaged in fraudulent billing practices, more than doubled their benefits by submitting false claims to the government, and illegally receiving reimbursements from CMS and DOH** in violation of state and federal laws.

158. Defendant Daniel E. Straus expected an additional $75 million dollars in DOH monies that was already reimbursed by Medicare for labor and expenses.

159. During the pandemic in 2020, Defendant Care One received an additional $90 million of advanced Medicare payments.

160. At this same time, Defendant Daniel E. Straus demanded the Senior Vice President of Finance to apply to the U.S. government's Small Business Association ("SBA") for a small business Paycheck Protection Program ("PPP") for a forgivable loan.

161. Defendant Care One was inappropriately approved for approximately $90 million dollars in PPP loans but should never have applied for or received the loan.

162. In or around mid-2020, Care One's then-General Counsel and Plaintiff Straus notified Defendant Daniel E. Straus that the PPP loans were for small businesses only, which Care One was not and did not qualify for as an organization pursuant to SBA guidelines, and therefore all monies lawfully had to be returned to the SBA.

163. Defendant Daniel E. Straus was furious after Care One's then-General Counsel and Plaintiff Straus initiated the return of the $90 million PPP loan.

   **f.   Defendants' Continued Fraudulent Healthcare Acts**

164. Upon Plaintiff Straus' return in September 2023, Plaintiff Straus discovered that Defendants Straus and Vazquez were more brazenly and openly engaging in fraudulent conduct, including (1) offering, paying, soliciting, or receiving remuneration to induce referrals for services reimbursable under federal health care programs, in violation of 42 U.S.C. § 1320a-7b (Anti-Kickback Statute); and (2) offering or paying remuneration to induce individuals to refer patients or purchase goods or services, in violation of N.J. Stat. § 26-2SS-15 (New Jersey Cost-Sharing and Inducement Statute) and (3) filing false Medicare claims. The company no longer had guardrails or a compliance program to speak of with the

departure of Ms. Martin, so Defendant Daniel E. Straus appointed Defendant Vazquez as compliance officer.

165.  Soon after Plaintiff Dr. Howard began working with Care One in early 2024, he observed an intense corporate focus on maximizing unlawfully Medicare revenues. Care One administrators were fixated on maintaining high patient Medicare numbers and inappropriately putting patients on profitable services like hospice for as long as possible without medical necessity all at Defendant Vazquez's direction and Defendant Daniel E. Straus' encouragement.

166.  Staff were pressured to maintain high Medicare census numbers by tracking and avoiding significant Medicare patient discharges or to target Medicare advantage plans to disenroll patients on traditional Medicare for the sole purpose to increase their Medicare revenue.

167.  The Medicare advantage disenrollment was solely focused on increasing Medicare census numbers and revenue and only focused on patients that could be disenrolled into traditional Medicare for the company's financial gain and not in the best interest of the patient.

168.  Defendant Vazquez made clear her focus was on Medicare and the buildings, and referral sources were illegally given monetary rewards for complying with this directive. Defendant Vazquez regularly made clear that she expected the patients to be placed on hospice both in the assisted living and nursing home regardless of criteria to increase to show a Medicare census increase in the hospice (Defendant Ascend) and maintain a robust volume of Care One patients regardless of meeting hospice criteria.

169.  Defendant Vazquez would make clear that the physicians were expected to refer to Care One's owned hospice company, Ascend, and put significant pressure on them to do so.  Defendant Vazquez would often extend patients on Medicare even when they no longer were in need Care One's level of care including at facilities in Massachusetts and elsewhere.

170.  For instance, on or about February 27, 2024, Defendant Vazquez sent an email congratulating the team at a Care One facility for having patient "disenrollment"

from Medicare advantage plans that month in which there is a targeted group of patients in red, yellow, and green to focus on.

171.    To Plaintiff Dr. Howard, such praise was deeply alarming suggesting that Care One's sole focus to their employees was on their Medicare census and revenue increase rather than focusing on what was best for the patient and making sure there was a plan to re-enroll the patient upon discharge or to make sure patient had a safe discharge plan when they were discharged. Dr. Howard reasonably believed that patients were illegally being placed into inappropriate care settings without much regard for the patient care and safety. These patients were often discharged without the attending physician even signing off on discharge orders to make sure patient was safe and receiving services that were medically appropriate.

172.    Plaintiff Dr. Howard also discovered that Care One was routinely providing valuable perks of courtside Knick tickets and Giants tickets to outside professionals in a position to refer Medicare patients to Care One nursing homes, as a *quid pro quo* for those referrals, violating the Anti-Kickback Statute and the Stark Law.

173.    Plaintiff Dr. Howard knew very clearly after attending a game himself realizing that these tickets came with expectations to refer Medicare patients to the buildings, and that these tickets had not being given to him with well-meaning intentions to socialize.

174.    Internal emails in late 2023 and early 2024 showed Defendants offering or distributing expensive courtside tickets to New York Knicks basketball games and box suites for New York Giants football games worth thousands of dollars per game, and other gifts to physicians, hospital case managers, and other referral sources in order to induce Medicare referrals to Care One facilities.

175.    In one email, Defendant Daniel E. Straus directed that a set of tickets be "held" for a particular physician that Defendant Vazquez was courting with the intention of inducing in exchange for receiving Medicare referrals.

176.    In another message, Defendant Daniel E. Straus said that the tickets should be used by the business development individuals in the company to induce Medicare referrals either through incentives to physicians or other referral sources.

177. Plaintiffs Straus and Dr. Howard immediately recognized and reasonably believed these lavish gifts as potential illegal kickbacks under the federal Anti-Kickback Statute and analogous state laws.

178. Another scheme Plaintiffs Straus and Dr. Howard encountered was Defendants' push for physicians to use nurse practitioners from Care One's affiliated Bridge Care instead of the physicians' own staff who were extensions of the Physician and supervised by the Physicians for services billed for patients.

179. Defendant Vazquez repeatedly encouraged Plaintiff Dr. Howard to utilize Care One's in-house (Bridge Care) nurse practitioners ("NP's") rather than the nurse practitioners employed by Dr. Howard's practice.

180. Defendant Care One, through Bridge Care, effectively offered to cover the cost of these in-house NPs, which would reduce Dr. Howard's payroll expenses.

181. However, this arrangement implicitly came with strings attached: Care One expected that physicians who accepted this "free" staffing would in return refer and allow Bridge Care to bill for the Physicians patients he was caring for to be able to remain in the Senior Medical Director Role. Care One's Bridge Care sole purpose was to induce Medicare referrals and bill for giving the doctor free labor for his patients or buy paying them with the expectation they refer to Care One's Bridge Care for Medicare billing under the physician's license in order to keep more patients within the Care One network. To Plaintiff Dr. Howard, this offer appeared to be another form of kickback or improper remuneration for referrals.

182. While treating patients, Plaintiff Dr. Howard objected to and identified multiple instances of improper Medicare billing practices at Care One facilities. He observed that patient medical charts often lacked required documentation yet Care One or its affiliates still billed Medicare for the related services.

183. For example, Plaintiff Dr. Howard noted cases where wound care treatments were billed even though there were no corresponding examination notes or wound measurements recorded.

184. Plaintiff Straus had encountered a wound care physician whom Defendant Vazquez was aware and encouraged to refer patients to the building and allowed

him to not document in the patients charts because he claimed he was not being paid by Medicare to document in the nursing home health records.

185. Throughout the month of March 2024, Plaintiffs Dr. Howard and Straus repeatedly met with Defendant Vazquez bringing to her attention the aforementioned illegal activities that she continuously endorsed.

186. The more that Plaintiffs Dr. Howard and Straus vocalized their complaints and objections to these illegal activities, the more punitive Defendant Vazquez became and gave Plaintiffs Straus and Howard ultimatums to stop complaining and keep quiet to keep their jobs.

187. Plaintiff Straus was made aware that this issue was one that Defendant Vazquez was aware of as the State had almost put the building into immediate jeopardy for patient harm or safety issues due to that exact issue, two months earlier.

188. Plaintiffs Dr. Howard and Ms. Straus became increasingly concerned that Care One staff or affiliated providers were engaging in Medicare fraud by billing for services not actually rendered or not properly documented.

189. True to his ethical oath and duties, Plaintiff Dr. Howard promptly raised these issues with Plaintiff Straus to Care One's building leadership and to Defendant Vazquez.

190. When Plaintiff Straus realized that Dr. Howard with his own objective eyes was seeing the fraudulent and illegal practices in the Company, Plaintiffs attempted to replace the physicians of concern with quality physicians that were trusted in the industry and attempted to elevate the quality of care with a more robust and well-rounded group of specialists to consult on the patients in the buildings under Dr. Howard's oversight.

### g. Plaintiffs' Straus and Dr. Howard's Whistleblowing Actions and Defendants' Retaliation for Same

191. In or about March 2024, Plaintiff Dr. Howard reported to Defendant Vazquez and other supervisors that Care One's referral incentives (e.g. pressuring physicians to refer Medicare patients if they were attendings in the buildings, paying staff to disenroll patients inappropriately at the expense of the patient, and the attempt to take patients from Dr. Howard without knowledge or oversight so that Bridge Care

could generate revenue in exchange for the director fee he was being paid and free nurse practitioner staffing for referrals) were illegal, and that the pattern of missing documentation and continued billing was potentially fraudulent.

192. Plaintiff Dr. Howard explicitly warned Defendant Vazquez in March 2024 that these practices violated federal law, including the Anti-Kickback Statute and Stark Law, and Medicare regulations.

193. Plaintiff Dr. Howard urged Defendants to cease such practices and to ensure accurate medical record-keeping for honest billing. Plaintiff Dr. Howard knew and understood the significant legal consequences that would arise to Defendants if these practices did not stop.

194. Instead of addressing Plaintiffs Straus and Dr. Howard's concerns, Defendants responded defensively and began treating Plaintiff Straus and Dr. Howard as a threat. Care One managers began to scrutinize Dr. Howard's work and lodge baseless criticisms against him in an effort to discredit his findings.

195. Initially, they complained that Dr. Howard was not spending enough time at the facilities, insinuating that he should increase the frequency of his patient visits. Yet when Dr. Howard did start seeing patients more frequently to assuage their concerns, those same managers switched tactics and accused him of seeing patients "too often" and over-servicing.

196. Defendants falsely documented and used these self-serving contradictory critiques as a pretext, manufactured to create a negative paper trail against Plaintiff Dr. Howard because it was becoming apparent to Defendants that he refused to go along with Defendants' unlawful schemes.

197. Defendants also explicitly threatened Plaintiff Dr. Howard's job in an effort to coerce him into participating in their referral scheme.

198. On several occasions in late March and early April 2024, Defendant Vazquez told Plaintiff Dr. Howard that Care One's patient census was below target and that he needed to bring in more Medicare referrals from hospitals. ***Defendant Vazquez indicated that if Dr. Howard did not leverage his relationships with hospital staff and other providers to funnel additional Medicare patients to Care One facilities, he would be removed from his position***.

199. These threats made the situation clear that if Dr. Howard continued to prioritize legal compliance and patient welfare over Defendants' revenue goals, his employment would be terminated.

200. However, Plaintiff Dr. Howard refused to succumb under Defendants' pressure. Instead, Plaintiff Dr. Howard continued to care for patients according to their medical needs rather than Defendants' financial demands, and he persisted in voicing his concerns about illegal practices to Defendants' agents.

201. Plaintiff Dr. Howard's principled stance further enraged Defendants' leadership. Upon information and belief, by mid-April 2024, Defendant Daniel E. Straus and Defendant Vazquez had privately resolved to fire and remove Dr. Howard, whom they now viewed as an obstacle to their unchecked control of operations.

202. During this time, Plaintiff Straus and Dr. Howard were beginning to uncover more clear Medicare fraud committed by Defendants that was strongly similar to Philip Esformes (the "Nursing Home King"), which was one of the largest convictions of a healthcare fraud case prosecuted in the Country.

203. Plaintiff Straus had made clear to Defendants Straus and Vazquez that she would not partake nor be part of this illegal activity and that the Company needed to put the right corrective actions including reinstating the compliance program, immediately. By threatening to cancel Dr. Howard's pay and signaling that he was no longer welcome, Defendants knew they were effectively forcing Plaintiffs Straus and Dr. Howard out with termination.

204. By this point, the working conditions for Plaintiffs Straus and Dr. Howard had become so hostile, so illegal/unethical/fraudulent and intolerable that no reasonable employee in their specific circumstances would tolerate the same, and was a constructive termination orchestrated by Defendant Daniel E. Straus due to Plaintiffs' whistleblowing.

205. In late March 2024, concurrently with Dr. Howard's internal whistleblowing, Plaintiff Straus independently discovered and objected to the Medicare fraud scheme orchestrated by Defendants Straus and Vazquez.

206. As noted, Plaintiff Straus learned that Defendant Vazquez had instructed Care One facilities to channel services through Bridge Care, Defendant Daniel E. Straus'

company, to fraudulently bill Medicare and private insurers for unperformed services. For example, nurse practitioners on Care One's payroll were billing for physician-like services that either never happened or were duplicative, and patients who should have been transferred to higher care were kept in place to allow ongoing billing.

207. On top of that, Defendants Daniel E. Straus and Vazquez were effectively stealing revenue from physicians like Dr. Howard by cutting them out of the care loop in favor of in-house billing.

208. Plaintiff Straus confronted her father with concrete examples of this fraud, overbilling, Medicare fraud, and demanded that the illegal activities stop.

209. Defendant Daniel E. Straus' response was explosive – he told his daughter to "shut [her] mouth" and mind her own business. At that moment, Plaintiff Straus realized that Defendant Daniel E. Straus himself had directed Defendant Vazquez to execute this scheme as a means to bolster Defendant BridgeCare's business at the expense of ethics and law.

210. On April 9, 2024, Plaintiff Straus re-vocalized her concern that Defendants Straus and Vazquez were not going to pay Plaintiff Dr. Howard in accordance with the payment schedule agreement they made with him.

211. Specifically, Plaintiff Straus, Plaintiff Dr. Howard, Defendant Daniel E. Straus, and Defendant Vazquez made an agreement as a condition of Dr. Howard's employment that he was supposed to be paid exactly two (2) weeks after completing one (1) month's service, which was ahead of the normal 30-day schedule of payment for contractors/consulting doctors working with Care One.

212. The reason for this time sensitive payment agreement is because Plaintiff Dr. Howard is then obligated to pay out his payroll of roughly six (6) NP's from the check he receives from Care One.

213. Despite making this basic payment agreement which is standard and custom in the industry, Defendant Daniel E. Straus became enraged that Dr. Howard was being paid at Plaintiff Straus' insistence and ahead of the 30-day schedule other Care One contractors typically follow.

214. In a text message exchange that day on April 11, 2024, Defendant Daniel E. Straus complained in text message that Dr. Howard had been given a **"sweetheart deal"** at Defendant Daniel E. Straus' reluctant approval. **(See "Ex. G" attached hereto)**

215. In text, Defendant Daniel E. Straus demanded to Plaintiff Straus to "***Please show the value that he has brought in terms of actual data of increased patients***."

216. He then demanded in text, ***"Show me Teaneck before and after Howard". "Show me Ridgewood."*** **(Id.)**

217. In actuality, what Defendant Daniel E. Straus was saying in code to Plaintiff Straus was that Plaintiff Dr. Howard never delivered him a dramatic increase in Medicare referrals at the Teaneck and Ridgewood facilities and, therefore, was overpaid (e.g. sweetheart deal) and had no use for him.

218. During this April 11th text message discussion, Defendant Daniel E. Straus decided that Plaintiff Dr. Howard would be terminated. **(Id.)**

219. In retaliation for his protected complaints and objections, Defendant Daniel E. Straus instructed that the one-month payment owed to Dr. Howard be canceled.

220. Defendant Daniel E. Straus informed Plaintiffs Straus and Dr. Howard of his decision and requested that the termination be treated as if he were "resigning."

221. However, Plaintiff Dr. Howard had no desire or intention to resign as he had just joined Care One with his team and had invested so much of his time, reputation and resources to put in place the necessary medical oversight and interventions for patients for Care One to safely care for the high acuity level of the patients that they had not been adequately receiving previously.

222. Plaintiff Straus was also constructively discharged that evening at Defendant Daniel E. Straus' realization that Plaintiffs Straus and Dr. Howard would not simply shut up and stop objecting and disclosing the widespread Medicare fraud that Defendant Daniel E. Straus did not want exposed.

223. Unwilling to be part of such blatant illegality, and fearful that her continued employment would force her to either participate in or implicitly condone Medicare fraud, Plaintiff Straus had no choice but to leave. Tellingly, Defendant Daniel E. Straus gave her an ultimatum: ***if she was not going to be a team player in his scheme, she should depart*** – which she did.

224. That same evening on April 11, 2024, Plaintiff Straus made one last attempt to appeal to her father's better judgment, warning him that the magnitude of fraud he was engaging in was comparable to the notorious Philip Esformes case (which resulted in a 20-year sentence for a nursing home operator). Rather than deter Defendant Daniel E. Straus, these warnings only solidified his resolve to silence Plaintiff Straus and anyone associated with her.

225. Within a few weeks, Defendants carried out their plan to oust Plaintiff Dr. Howard.

226. On or about May 10, 2024, Care One management, acting at the direction of Defendants Straus and Vazquez, abruptly terminated Dr. Howard's engagement and contract with Care One. **(See "Ex. H" attached hereto; Plaintiff Dr. Howard's Termination Letter, dated May 10, 2024)**

227. At the time, Plaintiff Dr. Howard had worked with Care One for only about two (2) months and had been diligently attending to patients and improving care metrics. There were no genuine performance issues for his termination, and the true reason for his firing was in retaliation for his objections to Defendants' unlawful conduct and Defendant Daniel E. Straus' dissatisfaction that Dr. Howard's fees were not "justified" because he was not meeting Defendant Daniel E. Straus' Medicare patient referral revenue expectations/quota. **(See "Ex. I" attached hereto; 4/25/24 text message between Defendant Vazquez and Dr. Howard)**

228. Defendants wasted no time in capitalizing on Dr. Howard's termination that locked him and his team out of the Electronic Health Records for their patients, thus preventing them from continuing to care for those patients and put them in a position where they were unable to bill for seeing those patients.

229. That very same day, May 10, 2024, Care One supervisors contacted the nurse practitioners and support staff who had been working for Dr. Howard and offered them employment directly with Care One's owned nurse practitioner company, Bridge Care.

230. In doing so, Defendants effectively poached majority of Dr. Howard's employed team overnight. This ensured that the patients under Dr. Howard's care would remain at Care One facilities under the care of Care One's own staff, rather than potentially following Dr. Howard elsewhere.

231.   It was apparent that Defendants' plan all along was to appropriate Plaintiff Dr. Howard's patients and operational team for themselves once they pushed him out.

232.   Defendants also directly tortiously interfered with Plaintiff Dr. Howard's relationships with his patients at Care One. After terminating Dr. Howard, Defendants informed those patients (and/or their families) that Plaintiff Dr. Howard was no longer associated with the facility and arranged to have other doctors or nurse practitioners assume their care so that Defendant Daniel E. Straus owned Bridge Care could self-refer and bill Medicare patients in violation of Stark laws.

233.   Plaintiff Dr. Howard was not given any opportunity to communicate with his patients or ensure a proper transition. By cutting off contact and continuity, Defendants intended to tortiously interfere and prevent Dr. Howard from continuing to treat those patients/relationships/contracts outside of Care One and to lock those patients into staying with Care One's owned ancillary companies and affiliated physicians including Defendant BridgeCare.

234.   To further justify their retaliatory conduct, Defendants embarked on a smear campaign against Plaintiff Dr. Howard and Plaintiff Straus.

235.   Defendant Care One representatives, including Defendant Vazquez, spread false statements to staff and others in the medical community that Dr. Howard had been providing substandard care and that he had been terminated for cause. They insinuated that Dr. Howard "over-treated" or "over-billed" patients and maligned his reputation and character.

236.   These statements by Defendants were utterly false. Plaintiff Dr. Howard provided appropriate care and was fired for whistleblowing, not for any performance issue. Defendants made these disparaging statements with knowledge of their falsity, in order to both discredit Dr. Howard and deter others from associating with him or similarly speaking out.

237.   As a result of Defendants' actions, Plaintiff Dr. Howard's career and medical practice were severely damaged. He lost the staff and infrastructure that he had established at Care One, as those individuals were absorbed into Defendants' employ.

238. Plaintiff Dr. Howard has lost current patients and potential future patients, whose trust in him was undermined by Defendants' actions and who were kept within the Care One system.

239. Plaintiff Dr. Howard's professional reputation has been tarnished by the false accusations, making other facilities and partners hesitant to work with him. The real reason for Dr. Howard's firing was crystal clear: he refused to participate in illegal kickbacks and spoke up about the widespread fraud.

240. As a result, he has suffered significant financial loss and emotional distress because of his attempt to highlight and correct the wrongdoing with the hopes that Care One would do the right thing.

241. During this same period, Plaintiff Elizabeth Straus was fighting an uphill battle with Defendant Daniel E. Straus and Defendant Vazquez. Plaintiff Straus had championed Dr. Howard's recruitment and fully supported his efforts to improve compliance and patient care. She shared and echoed the concerns he raised about illegal kickbacks and Medicare fraud.

242. Indeed, Plaintiff Straus herself had repeatedly urged Defendant Daniel E. Straus to halt such unlawful practices and prioritize legal compliance. Plaintiff Straus firmly believed that Care One's long-term success required operating within the bounds of the law and treating employees ethically—a viewpoint that clashed with Daniel's aggressive, profit-at-all-costs methods.

243. By siding with Dr. Howard and calling out wrongdoing, Plaintiff Straus drew escalating ire from Defendant Daniel E. Straus and his inner circle. In the aftermath of Dr. Howard's firing in May 2024, Plaintiff Straus openly criticized the decision as retaliatory and misguided. She told Defendant Daniel E. Straus that Herschmann and Defendant Vazquez were firing a good doctor for reporting fraud was unethical and would only compound the company's problems. Rather than heed her warnings, Defendant Daniel E. Straus became furious at Plaintiff Straus' "disloyalty." Defendant Daniel E. Straus began targeting Plaintiff Straus both personally and professionally and plotted to financially strangle her in ana effort to silence her.

244. As a façade since Care One had been operating without a corporate compliance program as required by participation in the Medicare program, Defendant Daniel E. Straus decided some window dressing was in order. With an internal announcement the Defendants declared a "major corporate restructuring of Care One's leadership". A new "Executive Committee" was appointed, comprised of Defendant Daniel E. Straus' close allies (including his brother, Joseph Straus, and other long-time associates), in an attempt to give the appearance of compliance. Simultaneously, Defendant Daniel E. Straus reconstituted the Board of Directors of the relevant corporate entities, naming himself, his brother Moshael Straus, and attorney Eric Herschmann, Esq. as the sole Board members in his continued effort to give the appearance of compliance.

245. This abrupt restructuring was Defendant Daniel E. Straus' predictable attempt to coverup his wrongdoing. Defendant Daniel E. Straus has a history of restructuring the Company in an effort to destroy the evidence one might have that could in anyway incriminate him for his illegal and unethical activities.

246. After leaving Care One, Plaintiffs Straus and Dr. Howard sought to turn the page by creating a new healthcare venture, called 18 Medical, in the spring of 2024. Their concept was to revolutionize care delivery for chronically ill and elderly patients by combining in-home services, telehealth, and advanced technology. The business model aligned with value-based care trends and promised to improve patient outcomes while lowering costs. With Plaintiff Straus' industry expertise and Dr. Howard's clinical leadership, 18 Medical had significant potential – *if* they could operate free from interference. Unfortunately, Defendants launched a concerted campaign of economic sabotage and defamation to ensure 18 Medical never got off the ground.

**h.    Defendant Daniel Straus' Pervasive Monitoring, Stalking, and Harassment of Plaintiff Straus After Her Retaliatory Discharge**

247. As Plaintiff Straus resisted these coordinated attacks that Defendant Daniel E. Straus was deploying, Defendants escalated their retaliation to an alarming personal level.

248.  Plaintiff Straus began to suspect that her communications were being monitored. After the rift with her father, she noticed that information she had shared in confidence was somehow reaching Defendant Daniel E. Straus' ears. Plaintiff determined that Defendant Daniel E. Straus had caused Defendants to monitor Plaintiff Straus' company email and messages.  Unbeknownst to Plaintiff Straus, Defendant Daniel E. Straus had also been monitoring Plaintiff Straus' phone calls by having Defendants review Plaintiff Straus' cell phone call logs even after she was constructively discharged from Care One.

249.  Defendant Daniel E. Straus was fearful that Plaintiffs Howard and Straus would pursue Defendants following their discharge for blowing the whistle and Defendant Daniel E. Straus' retaliatory conduct continued even after Plaintiffs were let go.

250.  On or around September 5, 2024, Defendant Daniel E. Straus unilaterally took away Plaintiff Straus' personal phone number she had for 25 years furthering the isolation and alienation to the world Plaintiff Straus had created over the last 39 years for her and her children.

251.  Continuing to punish and retaliate against Plaintiff Straus for being "disloyal" to Defendant Daniel E. Straus, and in his effort to control her, on or around September 12, 2024, Defendant Daniel E. Straus instructed his office to cancel Plaintiff Straus' health insurance that she and her children had, putting her health in jeopardy as she has a hereditary blood clotting disorder that requires medication and monitoring, thus furthering the pressure for her to comply with his demands and allow him to retain control of her. Defendant Daniel E. Straus wanted Plaintiff Straus to know that not only should she be deterred from pursuing her legal rights against Defendants together with Dr. Howard, but that she would pay a heavy price if she did not fall in line.

252.  Moreover, Plaintiff Straus soon realized she was being followed by individuals she did not recognize.  Defendant Daniel E. Straus stalked, harassed, monitored, tracked, and followed Plaintiff Straus everywhere she went.  He encouraged her abusive Husband to do the same, thus empowering him to escalate his physical, emotional, and psychological abuse to Plaintiff Straus.

253.  Defendant Daniel E. Straus had strategically trapped Plaintiff Straus and had his agents, Defendant Vazquez, Michael Greenspan, the trustees of Plaintiff Straus' trust, Joyce Straus and Mosheal Straus, and his attorneys and conspired with them to retain full power and control over Plaintiff Straus.  Defendant Daniel E. Straus and his agents, the trustees worked to stalk, harass, monitor, track and follow Plaintiff Straus and Dr. Howard both subjects of the Sage Intelligence coordinated surveillance that went on for months.  (**See Ex. J, Surveillance Report from Sage Intelligence, filed as evidence in Docket No. BER-C-000190-24, attached hereto)**

254.  Throughout the summer of 2024, Plaintiff Straus became suspicious and concerned that her privacy had been invaded and that she was being watched and monitored.

255.  In or around November 2024, she observed the same unknown man tracking her movements over the course of a day for several days. Upon information and belief, Defendant Daniel Straus and his agents, the trustees, had hired private investigators to stalk, harass, track, monitor and follow Plaintiff Straus everywhere she went.

256.  In or around December of 2024, Plaintiff Straus was stalked, tracked, followed and monitored from New Jersey all the way to Washington D.C. for the day when she went to meet with prospective business partners and counsel for 18 Medical.  The surveillance included illegally running all the license plates of those she met with so that Defendant Daniel E. Straus and his agents could successfully threaten and intimidate them to not do business with Plaintiff Straus and Dr. Howard, thus rendering 18 Medical, impossible to get off the ground.  Defendant Daniel E. Straus "investigative report" from Sage Intelligence, the private firm Defendant Daniel E. Straus hired to stalk and intimidate Plaintiffs Howard and Straus, referred to Dr. Howard and Elizabeth Straus as "subjects" of Defendant Daniel E. Straus' harassment, retaliatory and intimidating tactics.  Defendant Daniel E. Straus even had photos of Plaintiffs Howard and Straus meeting in person and at a bank—as if something about the actions in the photo were inappropriate and illegal. **(See Ex. J)**

257.  Plaintiff Straus' conversations were recorded at the direction of Defendant Daniel E. Straus, as well furthering the invasion of privacy she was experiencing at the behest of her Father's directives. These measures were intended to intimidate her and gather information on her activities. Discovering that her own father was subjecting her to surveillance was deeply distressing to Plaintiff Straus.

258.  By July 2024, Plaintiff Straus' personal life had become untenable from the abuse of her husband. Defendant Daniel E. Straus' campaign to destroy Plaintiff Straus was well under way and his desire to destroy the company she was attempting to build in partnership with Dr. Howard was under attack.

259.  Defendant Daniel E. Straus had threatened Plaintiff Straus after cutting off her only source of financial income to feed and care for her family, to force her into a powerless position financially. Plaintiff Straus began to realize that Defendant Daniel E. Straus would never allow her to leave this enterprise he had built, and he would control her livelihood and freedom.

260.  In essence Defendant Daniel E. Straus had made Plaintiff Straus detrimentally reliant on him. Defendant Daniel E. Straus' desperation to isolate Plaintiff Straus both personally and professionally had become apparent and she became fearful as her husband's continued abuse escalated.

261.  Defendant Daniel E. Straus' retaliation against Plaintiff Straus did not stop at forcing her out of the company; he also sought to cut her off from the financial benefits of the family business. Over the years, Defendant Daniel E. Straus had put in place various family trusts and corporate structures in which Elizabeth had sole beneficial interests in or and financial participation in. As the Patriarch and Settler of the Trust, Defendant Daniel E. Straus owed fiduciary duties to the trustees to act in the best interest of the beneficiary, Plaintiff Straus.

262.  However, once Plaintiff Straus fell out of favor, Defendant Daniel E. Straus abused his control over these structures to Plaintiff Straus' detriment. Upon information and belief, in 2024 Defendant Daniel E. Straus unilaterally altered or disregarded the terms of certain family trusts and shareholder agreements at his discretion to act in a punitive manner towards Plaintiff Straus and to restrict her ability to access her rightful share of profits and governance.

263.  Defendants further attempted to discredit Plaintiff Straus in the eyes of others to preempt any challenge she might pose. After Plaintiff Straus' departure, Defendant Daniel E. Straus and certain allies spread rumors among business contacts and extended family that Plaintiff Straus was "unstable" or had not acted in the company's best interests. These smears were false and were intended to isolate Plaintiff Straus, damage her reputation, and discourage others from taking her side or assisting her.

264.  Defendants' actions against Plaintiff Straus were directly motivated by her protected CEPA activities and opposition to Defendants' misconduct. Plaintiff Straus had objected to and refused to participate in violations of law (including healthcare fraud and kickbacks), and she had opposed practices that violated anti-discrimination laws (sexual harassment and retaliation).

265.  In reprisal for this, Defendants stripped her of her career, spied on her, and drove her out. The timing and nature of the adverse actions against Plaintiff Straus make the retaliatory intent unmistakable.

266.  The experiences of Plaintiffs Straus and Dr. Howard are part of a broader pattern at Care One in which those who speak out against misconduct are swiftly and harshly retaliated against. Defendants have demonstrated a practice of abusing their power to silence whistleblowers and to protect those engaged in wrongdoing. The constructive discharge of Plaintiff Straus and the firing of Plaintiff Dr. Howard send a chilling message to other employees: that raising legal or ethical concerns will result in personal and professional ruin.

267.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered extensive damages. Dr. Howard has lost his job at Care One and the associated income, as well as the investment he made in expanding his practice there. He also lost professional opportunities and endured damage to his reputation that will take significant effort to rehabilitate. Plaintiff Straus has lost her position and future career prospects in the family business, that she grew up in and worked in for over fifteen (15) years. Both Plaintiffs Straus and Dr. Howard have experienced significant emotional distress – Dr. Howard from the shock and

humiliation of being betrayed and maligned by his employer, and Plaintiff Straus from the profound betrayal by her father and the violation of her privacy and rights.

268. As a direct consequence of Defendants' illegal actions, Plaintiffs have been forced to retain an attorney to assert and protect their rights to prevent further harm to Plaintiffs.

## V. CLAIMS FOR RELIEF

### COUNT I
### Civil Racketeer Influenced and Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)
### (Conducting an Enterprise)
### (All Plaintiffs Against All Defendants)

269. Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

270. Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO"), 18 U.S.C. § 1962(c), based on a decades-long coordinated scheme by Defendant entities Care One LLC, Care One Management LLC, Care Realty LLC, Care Services LLC, Care Solutions LLC, Straus Group LLC, BridgeCare LLC, Ascend Hospice, and Partners Pharmacy to commit healthcare fraud, retaliate against and silence whistleblowers, sexually exploit employees, and suppress exposure of illegal conduct through a pattern of racketeering activity. The claims are fully pled and satisfy all RICO elements as required under Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985), and subsequent case law.

271. Plaintiffs allege the existence of an association-in-fact enterprise comprised of:

- Defendant Daniel E. Straus (leader and funder);
- Defendant Emily Vazquez (executive agent);
- Defendants Care One LLC, BridgeCare LLC, TotalCare LLC, Ascend Hospice, and Partners Pharmacy (corporate instruments); and
- Care One's attorneys and legal strategists

272. The above-mentioned individuals and entities conducted and participated in the enterprise to enrich its members through unlawful activities including but not limited to: concealing systemic Medicare fraud through improper billing and referral

kickbacks/ submitting false Medicare claims; inducing referrals through bribes and kickbacks; retaliating against Plaintiffs for objecting to and exposing that fraud/ Intimidating and terminating whistleblowers; defaming and silencing internal dissent; sex trafficking; interstate transportation; sexual coercion; forced labor; narcotic offenses; obstruction of justice; healthcare fraud; mail fraud; wire fraud; stalking; harassment; bribery; extortion; misusing corporate and trust assets for personal benefit; and suppressing a startup Management Services Organization ("MSO"), 18 Medical, focusing on physicians delivering chronic care management to their patients, which was founded by Plaintiffs Straus and Dr. Howard.

273. Defendants' enterprise has continuity, structure, and a shared unlawful purpose, satisfying the standard set forth in Boyle v. United States, 556 U.S. 938 (2009).

274. The enterprise engaged in a pattern of racketeering activity including the following predicate acts pursuant to § 1961(1):

- **Sex Trafficking in violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 *et seq.*:** Section 1591 of the TVPA criminalizes sex trafficking, wherein an individual recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person to engage in a commercial sex act. Defendants Daniel E. Straus and Vazquez engaged in sex trafficking in violation of the TVPA and TVPRA with employees of Defendants Straus and Care One, namely Plaintiff LaDue and Plaintiff Straus. Defendants Daniel E. Straus and Vazquez used housing, employment, career advancement, threat of termination of employment, trust payments/exploitation, and psychological manipulation to entice and coerce Plaintiffs Straus and LaDue into unwanted sexual acts and compliance.

- **Wire Fraud (18 U.S.C. § 1343):** Defendants used electronic emails and text messages to: coordinate illegal kickback schemes with referral sources (e.g., Defendant Daniel E. Straus sending texts and emails about reserving Knicks tickets for specific doctors in exchange for Medicare referrals); conceal Medicare fraud by instructing internal staff via emails to disenroll patients from Medicare Advantage and funnel them to higher-reimbursement traditional Medicare plans; manipulate internal communications to cover up non-payment

to physicians (e.g., promises to Dr. Howard via text/email followed by retaliation); and transmit coercive communications to Plaintiff Straus (e.g., text threats about her salary and trust income being contingent on obedience).

- **Mail fraud (18 U.S.C. § 1341)**: Defendants used the U.S. postal service to send physical documents, contracts, or settlement agreements related to: fraudulent Medicare billing (e.g., mailing invoices and false documentation to CMS or state agencies); illegal kickbacks masked as "consulting agreements" or "bonuses."; on-disclosure agreements and hush money settlements; and payroll documents falsely showing Plaintiff Straus' employment status or compensation.

- **Healthcare fraud (18 U.S.C. § 1347);** Defendants Care One and its affiliates (BridgeCare, Ascend Hospice, Partners Pharmacy) engaged in: billing for services never rendered or not medically necessary; falsifying patient records and medical charts; upcoding, double-billing, and extending patient stays purely for billing purposes; engaging in "bonus" schemes tied to Medicare referrals; operating a nurse practitioner scheme where physicians were incentivized to use BridgeCare staff. Dr. Howard discovered and reported these fraudulent practices internally and to supervisors.

- **Witness Retaliation (18 U.S.C. § 1513(e)):** Defendants retaliated against Plaintiffs for exposing and/or intending to expose Medicare fraud and sexual misconduct. Retaliatory acts include but are not limited to: termination of employment of Dr. Howard after reporting Medicare abuse; constructive discharge of Plaintiff Straus for uncovering fraud and sexual coercion; economic retaliation, by way of Defendant Daniel Straus cutting off trust payments to Plaintiff Straus, for whistleblowing and seeking divorce; public defamation, surveillance, and personal threats. (**See** Ex. J; **see also** Ex. K, **Certification of Tony Urena, dated October 18, 2024, filed as evidence in Docket No. BER-C-000190-24, attached hereto)**

- **Witness Tampering (18 U.S.C. § 1512)**: Defendants knowingly intimidated, harassed, and misled Plaintiffs Straus and Dr. Brandon Howard to prevent them from communicating with law enforcement and regulatory bodies

regarding Medicare fraud and sexual trafficking. Specific acts include: secret surveillance of Plaintiff Straus through security camera systems; intimidation via third-party investigators (Sage Intelligence); interference with legal counsel and threats involving child custody; misleading Plaintiff Straus into believing she was under federal investigation through false statements. **(See Ex. J and Ex. K)**

- **Extortion (Hobbs Act and state law)**: Defendants used threats of economic and physical harm to obtain compliance from Plaintiff Straus, including: withholding trust payments unless Plaintiff Straus obeyed personal and professional demands; threatening to strip child custody and financial support of Plaintiff Straus if she pursued divorce or lawsuits; conditioning access to housing, medical care, and employment on silence and compliance. **(See Ex. K)**
- **Interstate Stalking (18 U.S.C. § 2261A)**: Following Plaintiff Straus across state lines to Washington, D.C. on December 23, 2024, and on at least 15 other occasions. Use of interstate travel and facilities to further illegal schemes (Travel Act violations)**; (See Ex. J)**
- **State Crimes**: Including aggravated stalking (N.J.S.A. 2C:12-10), coercion (2C:13-5), and wire fraud under NJ's healthcare fraud laws; **(See Ex. J)**

275. These acts are part of a **related and continuous pattern** of unlawful conduct over a multi-year period, satisfying H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989).

276. Each Defendant knowingly conducted or participated in the enterprise's affairs through these racketeering acts. The actions were continuous, coordinated, and spanned at least five years, satisfying the "pattern" requirement under RICO § 1962(c).

277. Each Defendant conducted or participated in the affairs of the enterprise by orchestrating and executing retaliatory actions; facilitating fraudulent billing; utilizing legal authority to coerce and mislead Plaintiffs; using Care One entities and corporate infrastructure to carry out unlawful activity. This satisfies the

"operation or management" test from <u>Reves v. Ernst & Young</u>, 507 U.S. 170 (1993).

278.   As a direct and proximate result of the extreme, outrageous, malicious, willful, and reckless conduct of Defendants, Plaintiffs have suffered monetary loss, emotional pain and distress, and anguish.

279.   Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for treble damages for all economic losses, loss business value, unpaid wages, lost distributions, equitable relief, including but not limited to, injunctive relief barring continued retaliation, dissolution of fraudulent enterprise structures, correction of defamatory records, reinstatement of wrongfully denied payments, and restructuring of trust control, pursuant to 18 U.S.C § 1964(c), as well as compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**COUNT II**
**Civil Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. §§ 1962 (d)**
**(Conspiracy)**
**(All Plaintiffs Against All Defendants)**

280.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

281.   Plaintiffs assert claims under RICO § 1962(d), alleging Defendants knowingly agreed to facilitate the unlawful objectives described above in Count I. Each individual and entity stated in Count I took actions in furtherance of the scheme, including those who did not personally commit predicate acts.

282.   Each participant in the enterprise is jointly and severally liable under 18 U.S.C. § 1962(d).

283.   Plaintiffs were directly harmed in their business and property by the enterprise. Plaintiff Dr. Howard lost his practice and professional standing. Plaintiff Straus lost compensation, career trajectory, and control of her business and trust interests.

284.   Plaintiffs suffered direct injury to business and property, including but not limited to: loss of employment and compensation, destruction of business value in 18

Medical, loss of income from trust distributions wrongfully withheld, legal fees, emotional distress, and reputational damage.

285.   Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for treble damages for all economic losses, loss business value, unpaid wages, lost distributions, equitable relief, including but not limited to, injunctive relief barring continued retaliation, dissolution of fraudulent enterprise structures, correction of defamatory records, reinstatement of wrongfully denied payments, and restructuring of trust control, pursuant to 18 U.S.C § 1964(c), as well as compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**COUNT III**
**Trafficking Victims Protection Reauthorization Act ("TVPRA")**
**18 U.S.C. § 1591, 1595**
**(Plaintiffs Straus and LaDue Against Defendants Straus, Vazquez, and Care One)**

286.   Plaintiffs Straus and LaDue repeat and reallege the allegations set forth above as if fully stated herein.

287.   Section 1591 of the TVPA, now reauthorized as the TVPRA, criminalizes sex trafficking, wherein an individual recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person to engage in a commercial sex act.

288.   Section 1595 of the TVPRA provides a civil remedy for victims of sex trafficking against the perpetrator(s), or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. 18 U.S.C. § 1595(a).

289.   Defendants Daniel E. Straus and Vazquez committed violations of the TVPRA with employees of Defendants Straus and Care One, namely Plaintiff LaDue and Plaintiff Straus by knowingly recruiting, enticing, harboring, or transporting Plaintiffs Straus and LaDue, through the use of force, threats of force, coercion or

fraud to cause Plaintiffs Straus and LaDue in engage in commercial sex acts. (See 18 U.S.C. § 1595(a); see also <u>Acevedo v. EXP Realty, LLC</u> 713 F.Supp.3d 740, 764-65 (C.D. Cal. 2024<u>)).</u>

290. Between December 2019 through April 30, 2022, Plaintiff LaDue was sexually trafficked by Defendant Daniel E. Straus while she was employed as an Executive Assistant to Defendant Daniel E. Straus.

291. Less than two months after she began her position as Executive Assistant, Defendant Daniel E. Straus offered and enticed Plaintiff LaDue with a higher-paying position within his enterprise of companies under the condition that she was to report directly to him only with no intermediary or "go between" on all of our communications.

292. Within a few months of Plaintiff LaDue's employment with Care One as Defendant Daniel E. Straus' Executive Assistant, Defendant Daniel E. Straus enticed Plaintiff LaDue to move from New York City to New Jersey in housing paid-for by Defendant Straus to be closer to him. Defendant Daniel E. Straus offered to give Plaintiff LaDue one of his cars owned by his enterprise of companies.

293. Out of fear of retaliation, Plaintiff LaDue moved into an apartment in Fort Lee, New Jersey, paid for and rented by Defendant Straus, followed by a second apartment Defendant Daniel E. Straus owned and paid for Plaintiff, located at 1500 Teaneck Road, Teaneck, New Jersey 07666.

294. During this time period, Defendant Daniel E. Straus would frequently insist that Plaintiff LaDue come with him to various restaurants for dinner and drinks, including but not limited to, The River Palm, in Edgewater, NJ and the Ventanas, in Fort Lee, NJ where he would often get drunk and then become sexually aggressive, touching Plaintiff LaDue's legs, kissing her and making sexually explicit comments without her consent while impaired.

295. Defendant Daniel E. Straus referred to Plaintiff LaDue's job, the car, and housing arrangement were "benefits" and "perks" that were used by Defendant Daniel E. Straus to coerce, entice, lure and control Plaintiff LaDue.

296. Defendant Daniel E. Straus would regularly pressure Plaintiff LaDue to drink alcohol in the office during work hours against her will, knowing very well that

Plaintiff LaDue was a recovering alcoholic and was in treatment for her addiction/disability/handicap.

297.    On multiple occasions, Defendant Daniel E. Straus used alcohol to "lower her resistance" and effectively force Plaintiff LaDue to engage unwanted sexual acts that occurred both inside the Fort Lee corporate headquarters, and outside of it. Plaintiff LaDue could not refuse because Defendant Daniel E. Straus had absolute, unequivocal control over her income, housing, transportation and professional future.

298.    Plaintiff LaDue was no longer performing her duties as Executive Assistant and had become Defendant Daniel E. Straus' sexual slave in which she was ordered to submit to Defendant Daniel E. Straus' personal sexual desires at any time, oftentimes in the office.

299.    Plaintiff LaDue was not permitted to report to anyone else and when she resisted, she was professionally punished by Defendant Daniel E. Straus professionally, and marginalized and reminded that Defendant Daniel E. Straus was in control of her life both personally and professionally.

300.    As a result of Defendant Daniel E. Straus' abhorrent and illegal conduct, Plaintiff LaDue relapsed and had to be checked into a drug and alcohol rehabilitation center in New York City, where she had to receive shock therapy for her trauma from the sexual abuse by Defendant Daniel E. Straus.

301.    As to Plaintiff Straus, she was trafficked in violation of the TVPRA by Defendant Vazquez, coerced into sexual situations involving Defendant Vazquez for Defendant Daniel E. Straus' gratification and enticed by the promise that Plaintiff Straus's previous annual salary of $1 million, which she was earning prior to her 2021 constructive termination, would be restored.

302.    Defendant Vazquez acted effectively as Defendant Daniel E. Straus' "madam-like" enforcer, grooming women and coercing sexual submission to maintain control over their employment and Defendant Daniel E. Straus' participation and encouragement.

303. Furthermore, Plaintiff Straus was coerced into staying in an abusive marriage, living in Defendant Daniel E. Straus' controlled housing and enduring sexual demands and daily trafficking to/from New York and New Jersey.

304. Plaintiff Straus performed full time executive work at Care One without equitable compensation, while also being stripped of title and benefits, all under the threat of losing access to housing, insurance and income. Defendants Daniel E. Straus and Vazquez used financial dependence, surveillance and coercion to ensure compliance by Plaintiff Straus.

305. Defendants Daniel E. Straus and Vazquez knowingly engaged in a pattern and practice of trafficking female employees by enticing Plaintiffs Straus and LaDue with promises of employment, housing, career advancement, salary increases, and/or Trust payments in order to coerce Plaintiffs Straus and LaDue to engage into unwanted sexual acts, and then used the threat of termination of employment to ensure compliance. See Acevedo, 713 F.Supp.3d 740; David v. Weinstein Company, LLC, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019).

306. Defendant Daniel E. Straus committed violations of the TVPRA not just with Plaintiff LaDue, but with multiple other women who were either promoted, retained, terminated or retaliated against based on their sexual relationship and status with Defendant Daniel E. Straus. The enterprise created a pattern of coercion through gaslighting, surveillance, public isolation and professional sidelining when Plaintiff Straus, Plaintiff LaDue or other women resisted.

307. Defendant Vazquez is also an accomplice in Defendant Daniel E. Straus' violations of the TVPRA as she was Defendant Daniel E. Straus' mistress and an executive of Defendant Care One, who was well aware of his unlawful sexual relationships with employees and illegal trafficking acts and served as a part of Defendant Daniel E. Straus' coordinated enterprise that used corporate power to exploit and silence women.

308. As such, Defendants Daniel E. Straus and Vazquez are directly liable under 18 U.S.C 1591 (a)(1).

309. Furthermore, Defendant Care One, who is owned and operated by Defendant Daniel E. Straus, with assistance from Executive Defendant Vazquez, knowingly

benefited, either financially or receiving something of value via Plaintiff Straus and LaDue's employment with Care One, by participating in the sexual trafficking of female employees of Care One and therefore, is liable as a beneficiary under 18 U.S.C. § 1595(a).

310.    The willful and malicious actions of Defendants Straus, Vazquez, and Care One violate the TVPRA and therefore, Plaintiffs Straus and LaDue are entitled to civil remedies.

311.    Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs Straus and LaDue demand judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT IV
### New Jersey Conscientious Employee Protection Act ("CEPA")
### N.J.S.A 34:19-1 et seq.
### (Plaintiffs Straus and Dr. Howard Against All Defendants)

312.    Plaintiff Straus and Plaintiff Dr. Howard repeat and reallege the allegations set forth above as if fully stated herein.

313.    The New Jersey Conscientious Employee Protection Act ("CEPA") prohibits an employer from retaliating against an employee who disclosed or threatens to disclose an activity, policy or practice of any employer that violates the law, a rule or regulation.

314.    Specifically, CEPA prohibits "any retaliatory action against an employee" because the employee "discloses, or threatens to disclose to a supervisor or to any public body any activity, policy or practice of the employer" that is "a violation of a law, a rule or regulation." N.J.S.A. 34:19-1 et seq.

315.    As to Plaintiff Dr. Howard's CEPA claim, Dr. Howard objected to and refused to participate in actions that he reasonably believed were illegal, including Medicare fraud and kickback schemes, and he reported these issues to Defendants' management.

316. These activities by Dr. Howard constitute protected whistleblowing activity under CEPA, N.J.S.A. 34:19-3.

317. Defendants thereafter took adverse employment actions against Dr. Howard, including terminating his employment/engagement and sabotaging his practice, because of his protected activity. Defendants, through their agents, including Defendants Vazquez and Daniel E. Straus, explicitly threatened Dr. Howard with termination if he did not comply with their unlawful demands, and then carried out that threat when he continued to object.

318. Dr. Howard's complaints about illegal practices were a direct and proximate cause of the adverse actions taken against him. The temporal proximity between his protected complaints and his termination, as well as Defendants' express statements and conduct, establish a causal connection and retaliatory intent.

319. By retaliating against Dr. Howard for engaging in protected whistleblowing, Defendants violated CEPA.

320. All Defendants who participated in the decision or effort to terminate and defame Dr. Howard are individually liable under CEPA (which imposes liability on individual supervisors who retaliate).

321. As a result of Defendants' CEPA violations, Dr. Howard has suffered damages including loss of employment, loss of income and benefits, damage to his reputation, and emotional distress.

322. As to Plaintiff Straus, she engaged in protected activity under CEPA by, among other things, objecting to and refusing to participate in Defendants' illegal practices (including healthcare fraud and kickbacks) and by informing Defendants that such practices were wrongful or unlawful. She made these objections known to Defendants, including Defendant Daniel E. Straus, internally.

323. Defendants took adverse employment actions against Plaintiff Straus because of her whistleblowing and objections. These adverse actions included stripping her of job duties, subjecting her to surveillance and a hostile work environment, and effectively forcing her out of the company (constructive discharge).

324. Plaintiff Straus' protected activity was a substantial or determinative factor in Defendants' decision to marginalize and discharge her. The retaliatory motive is

demonstrated by the timing of the actions against her immediately after her protected objections and by direct statements and patterns of conduct by Defendants.

325. Defendants' retaliation against Plaintiff Straus for engaging in protected conduct violated CEPA, N.J.S.A. 34:19-3.

326. Individual Defendants who aided, abetted, or participated in the retaliatory scheme, including Defendants Straus and Vazquez, are personally liable under CEPA for their actions.

327. As a direct and proximate result of Defendants' CEPA violations, Plaintiffs Straus and Dr. Howard have suffered damages including loss of employment, loss of income and benefits, lost career opportunities, and emotional distress.

328. Defendants acted with intentional malice toward Plaintiffs Straus and Dr. Howard, such that an award of punitive damages under CEPA is warranted.

329. Additionally, under N.J.S.A. 34:19-6, Plaintiffs Straus and Dr. Howard are entitled to recover reasonable attorneys' fees and costs as a prevailing CEPA plaintiff.

330. Defendants' conduct was willful and in flagrant disregard of Plaintiffs' rights, warranting the imposition of punitive damages under CEPA.

331. As a direct and proximate result of the extreme, outrageous, malicious, willful, and reckless conduct of Defendants, Plaintiffs have suffered monetary loss, emotional pain and distress, and anguish.

332. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs Straus and Dr. Howard demand judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT V
### New Jersey Conscientious Employee Protection Act ("CEPA")
### N.J.S.A 34:19-1 et seq.
### (Aiding and Abetting as to Defendants Straus and Vazquez)

333. Plaintiffs Straus and Dr. Howard repeat and reallege the allegations set forth above as if fully stated herein.

334. Plaintiffs Straus and Dr. Howard engaged in protected whistleblowing activity under CEPA, N.J.S.A. 34:19-3, by objecting to and refusing to participate in Defendants' illegal practices, including healthcare fraud and kickbacks schemes, and by reporting these issues to Defendants' management, including Defendant Daniel E. Straus.

335. Defendants Daniel E. Straus and Vazquez thereafter took adverse employment actions against Dr. Howard, including terminating his employment/engagement and sabotaging his practice, because of his protected activity. Defendants Straus and Vazquez explicitly threatened Dr. Howard with termination if he did not comply with their unlawful demands, and then carried out that threat when he continued to object.

336. Defendants Daniel E. Straus and Vazquez took adverse employment actions against Plaintiff Straus because of her whistleblowing and objections. These adverse actions included stripping her of job duties, subjecting her to surveillance and a hostile work environment, and effectively forcing her out of the company (constructive discharge).

337. Defendants Daniel E. Straus and Vazquez's retaliation against Plaintiff Straus for engaging in protected conduct violated CEPA, N.J.S.A. 34:19-3.

338. Defendants Daniel E. Straus and Vazquez aided, abetted, or participated in the retaliatory scheme, and therefore, are individually liable under CEPA for their actions.

339. Defendants Daniel E. Straus and Vazquez acted with intentional malice toward Plaintiffs Straus and Dr. Howard, such that an award of punitive damages under CEPA is warranted.

340. As a direct and proximate result of Defendants' CEPA violations, Plaintiffs Straus and Dr. Howard have suffered damages including loss of employment, loss of income and benefits, reputational damage, lost career opportunities, and emotional distress.

341. Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights. Plaintiffs Straus and Dr. Howard are entitled to recover reasonable attorneys' fees and costs as a prevailing CEPA plaintiff pursuant to N.J.S.A. 34:19-6,

**WHEREFORE**, Plaintiffs Straus and Dr. Howard demand judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT VI
### New Jersey's Law Against Discrimination, <u>N.J.S.A.</u> §10:5-1 et seq.
### (Discrimination Based on Gender, Religion,
### Marital Status, and Association – Disparate Treatment)
### (Plaintiff Straus Against All Defendants)

342. Plaintiff Straus realleges and reincorporates herein the above paragraphs.

343. At all relevant times, Plaintiff Straus was an "employee" within the meaning of the NJLAD, N.J.S.A. 10:5-1 et seq., and Defendants, particularly the Care One corporate entities and Defendant Daniel E. Straus, were her "employer" or persons liable under the NJLAD.

344. Defendant Daniel E. Straus and the corporate Defendants, as Plaintiff Straus' employer, engaged in unlawful employment discrimination against Plaintiff Straus on the basis of her religion, sex, and marital status, in violation of the New Jersey Law Against Discrimination (NJ LAD, N.J.S.A. 10:5-1 et seq.) and, to the extent applicable, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

345. Plaintiff Straus is a member of a protected class by virtue of her sex. Defendants, through the actions of Defendants Daniel E. Straus and Vazquez, Daniel E.

Straus's Mistress/ Executive, subjected Plaintiff to a workplace permeated with severe and pervasive sexual misconduct and gender-based favoritism, as detailed above.

346. Plaintiff Straus is Caucasian and Orthodox Jewish. The discrimination she faced was based on her association with a Dominican Catholic man and her deviation from the Orthodox religious/marital norms imposed by her father, Defendant Daniel E. Straus.

347. Plaintiff Straus was paid less than her brother and male counterparts due solely to her gender, as admitted by Defendant Daniel E. Straus.

348. Defendants' work environment promoted women based on sexual relationships with Defendant Daniel E. Straus while sidelining others, including Plaintiff, who refused to participate or endorse such misconduct.

349. Defendant Daniel E. Straus repeatedly punished Plaintiff Straus for being divorced or attempting to divorce, including cutting off her trust distributions and eventually removing her from the family business.

350. Defendants' conduct as described above constitutes unlawful discrimination on the basis of sex in violation of the NJLAD.

351. As a direct proximate result of this discrimination, Plaintiff suffered humiliation, emotional distress, mental anguish, physical discomfort, shame and embarrassment and damage to her position within the company. Defendants are liable for all compensatory damages arising from this discrimination. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue to be experienced into the future.

352. Defendants' actions were egregious and willful, justifying the imposition of punitive damages under the NJLAD.

353. Further, Plaintiff Straus has been required to retain an attorney to assist her in asserting her claims and protecting her rights.  The NJLAD further provides that a prevailing plaintiff is entitled to reasonable attorneys' fees and costs, which Plaintiff Straus hereby seeks to recover.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**COUNT VII**
**New Jersey's Law Against Discrimination ("LAD"), N.J.S.A. §10:5-1 et seq.**
**(Retaliation)**
**(Plaintiff Straus Against All Defendants)**

354.   Plaintiff Straus realleges and reincorporates herein the above paragraphs.

355.   At all relevant times, Plaintiff Straus was an "employee" within the meaning of the NJLAD, N.J.S.A. 10:5-1 et seq., and Defendants, particularly the Care One corporate entities and Defendant Daniel E. Straus, were her "employer" or persons liable under the NJLAD.

356.   Plaintiff Straus engaged in protected activity under the NJLAD by opposing and complaining about practices she reasonably believed to be unlawful gender discrimination and sexual harassment, including objecting to the favoritism shown towards women involved with Defendant Daniel E. Straus.

357.   In response to her opposition to discrimination, Defendants retaliated against Plaintiff Straus with numerous adverse employment actions, including removing her from her position, excluding her from decisions, subjecting her to undue scrutiny and harassment, including surveillance, and ultimately forcing her out of the company.

358.   Upon discovering Plaintiff Straus' personal, romantic relationship with a Dominican Catholic man in 2021, Defendant Daniel E. Straus terminated Plaintiff from her executive position at Care One.

359.   In 2024, Plaintiff Straus was constructively discharged for refusing to cover up or ignore Defendant Daniel E. Straus' and Vazquez's sexual misconduct and Defendants' Medicare fraud.

360.  Plaintiff Straus was forced to report to and defer to women in sexual relationships with Defendant Daniel E. Straus and was subjected to continuous emotional manipulation and humiliation.

361.  Defendant Daniel E. Straus' slurs, discriminatory comments, and admitted gender-based decisions were directly connected to Plaintiff Straus' termination and marginalization.

362.  Such actions would dissuade a reasonable employee from complaining about discrimination. The timing and circumstances of these adverse actions indicate they were directly related to Plaintiff Straus' protected activity.

363.  Defendants' justification for her termination is pretextual and inconsistent with Plaintiff Straus's long-standing leadership record and operational success.

364.  Defendants' retaliatory conduct toward Plaintiff Straus violated the NJLAD's provisions that prohibit retaliation against an employee for opposing practices forbidden by the NJLAD. Defendant Care One and its affiliates are liable as Plaintiff Straus' employers.

365.  Although not directly responsible for the initial discriminatory acts, Defendant Vazquez furthered the marginalization and damage to Plaintiff Straus.

366.  As a direct and proximate result of the retaliation, Plaintiff Straus suffered the loss of her employment (constructive discharge), loss of income and benefits, and emotional distress.

367.  Individual Defendants who aided and abetted the retaliation, including Defendants Straus and Vazquez are personally liable under the NJLAD, N.J.S.A. 10:5-12(e), for aiding and abetting, inciting, or coercing the discrimination.

368.  Defendants' retaliatory conduct was willful and malicious, warranting punitive damages under the NJLAD.

369.  As a direct and proximate result of the actions of Defendants, Plaintiff Straus has suffered mental anguish, physical discomfort, emotional distress, pain and suffering, shame and embarrassment.  Furthermore, Plaintiff Straus has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue to be experienced into the future.

370.    Further, Plaintiff Straus has been required to retain an attorney to assist her in asserting her claims and protecting herrights.  The NJLAD further provides that a prevailing plaintiff is entitled to reasonable attorneys' fees and costs, which Plaintiff Straus hereby seeks to recover.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT VIII

### New Jersey's Law Against Discrimination, N.J.S.A. §10:5-1 et seq.
### (Sexual Harassment – Hostile Work Environment)
### (Plaintiff Straus Against All Defendants)

371.    Plaintiff Straus realleges and reincorporates herein the above paragraphs.

372.    At all relevant times, Plaintiff Straus was an "employee" within the meaning of the NJLAD, N.J.S.A. 10:5-1 et seq., and Defendants, particularly the Care One corporate entities and Defendant Daniel E. Straus, were her "employer" or persons liable under the NJLAD.

373.    Female employees at Care One, including Plaintiff Straus, were exposed to unwelcome sexual behavior – for example, witnessing the CEO and other top male executives engage in sexual affairs or advances with subordinate women, and seeing those who acquiesced receive favoritism. This conduct was unwelcome to Plaintiff Straus and offensive to any reasonable person in Plaintiff's position.

374.    The sexually charged and demeaning environment unreasonably interfered with Plaintiff Straus' work performance and created an intimidating, hostile, and offensive work environment for her as a female executive who did not participate in or condone such conduct.

375.    This conduct was severe or pervasive enough to alter the conditions of Plaintiff Straus' employment and create a hostile or abusive working environment. Plaintiff

Straus, as a female executive who did not acquiesce to such conduct, found the environment intimidating and hostile.

376. Defendants knew or should have known of the ongoing sexual harassment and hostile environment. In fact, the primary harasser was the owner and CEO, Defendant Daniel E. Straus, whose actions are automatically imputed to the employer. Despite this knowledge, Defendants failed to take adequate measures to prevent or correct the harassment.

377. The foregoing facts and circumstances demonstrate that Defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. §10:501 et seq., by engaging in and/or aiding and abetting in sexually harassing conduct that was severe and pervasive enough to create a hostile work environment, which forced Plaintiff Straus to quit her job.

378. As a direct proximate result of the unlawful sexual harassment and hostile work environment, Plaintiff Straus suffered humiliation, emotional distress, mental anguish, physical discomfort, shame and embarrassment and damage to her position within the company. Defendants are liable for all compensatory damages arising from this hostile work environment. Furthermore, Plaintiff Straus has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue to be experienced into the future.

379. Defendants' actions were egregious and willful, justifying the imposition of punitive damages under the NJLAD.

380. Further, Plaintiff Straus has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights. The NJLAD further provides that a prevailing plaintiff is entitled to reasonable attorneys' fees and costs, which Plaintiff Straus hereby seeks to recover.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory

damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT IX

**New Jersey's Law Against Discrimination ("LAD"), N.J.S.A. §10:5-1 et seq.**
**(Aiding and Abetting as to Defendants Daniel E. Straus and Vazquez)**

381.  Plaintiff Straus realleges and reincorporates herein the above paragraphs.

382.  At all relevant times, Plaintiff Straus was an "employee" within the meaning of the NJLAD, N.J.S.A. 10:5-1 et seq., and Defendants, particularly the Care One corporate entities and Defendant Daniel E. Straus, were her "employer" or persons liable under the NJLAD.

383.  Plaintiff Straus engaged in protected activity under the NJLAD by opposing and complaining about practices she reasonably believed to be unlawful gender discrimination and sexual harassment, including objecting to the favoritism shown towards women involved with Defendant Daniel E. Straus.

384.  In response to her opposition to discrimination, Defendants Daniel E. Straus and Vazquez retaliated against Plaintiff Straus with numerous adverse employment actions, including removing her from her position, excluding her from decisions, subjecting her to undue scrutiny and harassment, including surveillance, and ultimately forcing her out of the company.

385.  Upon discovering Plaintiff's personal, romantic relationship with a Dominican Catholic man in 2021, Defendant Daniel E. Straus terminated Plaintiff from her executive position at Care One.

386.  In 2024, Plaintiff was constructively discharged for refusing to cover up or ignore Defendant Daniel E. Straus' and Vazquez's sexual misconduct and Defendants' Medicare fraud.

387.  Plaintiff was forced to report to and defer to women in sexual relationships with Defendant Daniel E. Straus and was subjected to continuous emotional manipulation and humiliation.

388.  Defendant Daniel E. Straus' slurs, discriminatory comments, and admitted gender-based decisions were directly connected to Plaintiff Straus' termination and marginalization.

389.  Defendants Daniel E. Straus and Vazquez are individually liable under NJLAD for aiding and abetting, inciting, and/or coercing the discrimination.

390.  Defendants Daniel E. Straus and Vazquez's retaliatory conduct was willful and malicious, warranting punitive damages under the NJLAD.

391.  As a direct and proximate result of the actions of Defendants Daniel E. Straus and Vazquez, Plaintiff Straus has suffered humiliation, mental anguish, physical discomfort, emotional distress, pain and suffering, shame and embarrassment. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue to be experienced into the future.

392.  Further, Plaintiff Straus has been required to retain an attorney to assist Plaintiff in asserting her claims and protecting her rights.  The NJLAD further provides that a prevailing plaintiff is entitled to reasonable attorneys' fees and costs, which Plaintiff Straus hereby seeks to recover.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for lost wages, reinstatement, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT X
**Breach of Fiduciary Duty**
**(Plaintiff Straus Against All Defendants)**

393.  Plaintiff Straus repeats and realleges the allegations set forth above as if fully stated herein.

394.  Defendant Daniel Straus owed Plaintiff Straus fiduciary duties of loyalty, good faith, and care by virtue of their family business relationship and the trust and corporate structures through which Plaintiff Straus' interests in the Care One enterprise were held. As the controlling shareholder and trustee, Defendant Daniel E. Straus was

obligated to act in the best interests of Plaintiff, and not to exploit his control to her detriment.

395. Defendant Daniel E. Straus and upon information and belief, with the assistance of Care One's General Counsel, breached their fiduciary duties to Plaintiff Straus by engaging in trust control, legal deception, manipulation of financial resources, self-dealing and acts of bad faith designed to freeze Plaintiff Straus out and to appropriate benefits that should have accrued to her.

396. These breaches include Defendant Daniel E. Straus unilaterally restructuring the company to remove Plaintiff Straus's governance rights, diverting corporate opportunities and profits away from entities where Plaintiff Straus had an interest, and altering or ignoring the terms of family trusts to deny Plaintiff Straus financial benefits.

397. Defendants' actions were taken not for any legitimate business purpose, but to consolidate Defendant Daniel E. Straus' personal power and punish Plaintiff Straus for opposing him.

398. Defendant Daniel E. Straus' conduct violated the duty of loyalty and good faith that he owed to Plaintiff Straus, and it constituted a misuse of the trust and confidence placed in him.

399. As a direct and proximate result of these breaches, Plaintiff Straus has suffered substantial damages, including the loss of economic benefits (such as salary, dividends, distributions, and the increase in value of her ownership interests) that she would have obtained absent Defendants' disloyal acts. She also suffered irreparable harm to her standing in the family enterprise.

400. Defendants' breaches of fiduciary duty were committed willfully and with wanton disregard of Plaintiff Straus's rights, justifying an award of punitive damages. In addition, equity may require the imposition of constructive trusts or other equitable relief to restore Plaintiff Straus's rightful interests.

401. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost

wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**COUNT XI**
**Breach of Contract**
**(Plaintiff Dr. Howard Against All Defendants)**

402. Plaintiff Dr. Howard repeats and realleges the allegations set forth above as if fully stated herein.

403. Plaintiff Dr. Howard and one or more of the Defendant Care One entities entered into an agreement or multiple agreements, whether oral or written, under which Dr. Howard would provide medical services at Defendants' facilities and, in return, Defendants would compensate him and support his practice (including providing necessary resources and timely payment). In the alternative, Defendants made clear and definite promises to Dr. Howard that induced him to join Care One (such as the promise that he would be paid for his work and not face the prior issues of non-payment).

404. Plaintiff Dr. Howard performed all of his obligations under the agreement and in reasonable reliance on Defendants' promises. He left other opportunities to work with Care One, treated patients in Care One's facilities, and built a care team to serve those facilities, all in reliance on the understanding that Defendants would honor their commitments to him.

405. Defendants materially breached the agreement and their promises by failing to compensate Dr. Howard as agreed by cancelling the check that was due to him, by terminating his engagement without good cause, which was contrary to the expectations set when he was recruited, and by actively undermining the very practice they had promised to support.

406. Defendants' breach of the covenant of good faith and fair dealing is also evident: rather than dealing fairly with Plaintiff Dr. Howard, they acted with ulterior motives or retaliation and self-interest that destroyed Dr. Howard's rights to receive the benefits of the agreement.

407. Injustice can only be avoided by enforcing Defendants' promises to Dr. Howard. To the extent no express contract term guaranteed Dr. Howard's continued

engagement, Defendants' promises are enforceable under promissory estoppel because Dr. Howard reasonably relied on them to his detriment.

408. As a direct and proximate result of Defendants' breach and/or failure to honor their promises, Dr. Howard has suffered damages including, but not limited to, unpaid compensation for services he rendered, lost future earnings and profits from the premature termination of the relationship, and expenses and losses incurred in reliance on Defendants' assurances.

409. Plaintiff Dr. Howard seeks all available damages for Defendants' breach of contract, including expectation damages sufficient to put him in the position he would have been in had Defendants kept their promises, as well as any incidental or consequential damages resulting from the breach.

410. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting his claims and protecting his rights.

**WHEREFORE**, Plaintiff Dr. Howard demands judgment against Defendants for lost wages, reinstatement, back pay, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

### COUNT XII
### Unjust Enrichment/Quantum Meruit
### (Plaintiffs Straus and Dr. Howard Against All Defendants)

411. Plaintiffs Straus and Dr. Howard repeat and reallege the allegations set forth above as if fully stated herein.

412. Under the doctrine of promissory estoppel or unjust enrichment, Dr. Howard seeks to recover the reasonable value of the services he provided (quantum meruit) to prevent Defendants from retaining benefits without payment.

413. In addition to the specific breaches described above, Defendants' actions toward Plaintiff Dr. Howard and Plaintiff Straus demonstrate a pervasive pattern of malicious, retaliatory, and self-serving conduct in violation of basic principles of

fairness, fiduciary duty, contract law, and public policy. These actions were not isolated incidents but part of a deliberate scheme to suppress dissent, obstruct lawful business efforts, and maintain control over corporate and personal power at all costs.

414.    As to Plaintiff Straus, from approximately September 2023 through April 2024, Plaintiff Straus performed regular, full-time work on behalf of Care One LLC and its affiliated companies in an executive operational capacity.

415.    Plaintiff Straus' responsibilities included: overseeing physician recruitment and network expansion; directing operational improvement and compliance; presenting monthly performance metrics; coordinating the creation and implementation of Care One's new regional medical model; acting with supervisory and strategic authority across multiple Care One entities.

416.    Despite performing valuable services at an executive position that directly benefited the business, Plaintiff Straus was paid a minimal salary of $30,000 during this time.

417.    Defendants instead directed compensation through trust distributions, which were not recorded or reported as wages; were contingent upon personal compliance with unrelated, non-business demands (e.g., remaining married, avoiding Dr. Howard); were unilaterally controlled by Defendant Daniel Straus, effectively functioning as non-guaranteed, coercive "payments."

418.    Plaintiff Straus seeks to recover the reasonable value of the services she provided (quantum meruit) to prevent Defendants from retaining benefits without payment.

419.    Plaintiffs bring this complaint to seek full relief for the harms they have suffered, to hold Defendants accountable for their misconduct under both federal and state law, and to ensure that unlawful practices—particularly those involving fraud, retaliation, and abuse of power—are stopped and remedied.

420.    Further, Plaintiffs have been required to retain an attorney to assist them in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs Straus and Dr. Howard demand judgment against Defendants for lost wages, reinstatement, back pay, front pay, retirement contributions equivalent to her executive trajectory, mandatory training and monitoring of corporate leadership to

prevent reoccurrence, removal of false records or defamatory notations about Plaintiff Strauss from personnel files or internal communications, compensatory damages, punitive damages, statutory damages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**COUNT XIII**
**Intentional Infliction of Emotional Distress**
**(Plaintiff Straus Against Defendants Daniel E. Straus and Vazquez)**

421.  Plaintiff Straus repeats and realleges the allegations set forth above as if fully stated herein.

422.  Defendants Daniel E. Straus and Vazquez engaged in extreme and outrageous conduct towards Plaintiff Straus. This conduct includes, but is not limited to, orchestrating a campaign to oust her from the family business in a humiliating manner, betraying the fundamental trust inherent in their family and professional relationship, secretly surveilling her communications and personal movements, and spreading false and derogatory rumors about her mental stability. Such conduct is beyond all bounds of decency and utterly intolerable in a civilized community.

423.  Defendants intended to cause Plaintiff Straus severe emotional distress or acted in reckless disregard of the high probability that their conduct would cause her severe emotional distress. Defendant Daniel E. Straus, in particular, knew that targeting his own daughter in this fashion would likely cause extreme emotional harm.

424.  As a direct and proximate result of Defendants' outrageous conduct, Plaintiff Straus suffered severe emotional distress. She experienced, and continues to experience, extreme anguish, humiliation, and anxiety. The stress of being betrayed and spied upon by her father and losing her career under such conditions has caused lasting psychological trauma.

425.  Defendants' conduct was willful and malicious. Plaintiff therefore seeks damages for the severe emotional pain and suffering inflicted upon her, as well as punitive damages to punish and deter such egregious behavior in the future.

426.  Plaintiff Straus has incurred and may continue to incur expenses for medical or therapeutic care to deal with the emotional distress caused by Defendants' conduct.

427.  Further, Plaintiff Straus has been required to retain an attorney to assist her in asserting her claims and protecting her rights.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT XIV
### Civil Conspiracy
### (Plaintiffs Straus and Dr. Howard Against All Defendants)

428.  Plaintiffs Straus and Dr. Howard repeat and reallege the allegations set forth above as if fully stated herein.

429.  Defendants, including, but not limited to, Defendants Straus and Vazquez, combined and agreed with one another to commit the unlawful acts described in this Complaint. They formed a common plan or understanding to retaliate against Plaintiff Dr. Howard for his whistleblowing and to Plaintiff Straus for siding against Defendant Daniel E. Straus, through acts such as wrongful termination, defamation, tortious interference, and breach of fiduciary duty.

430.  One or more of the co-conspirators committed overt acts in furtherance of this conspiracy. Such overt acts include Defendant Vazquez carrying out the termination and disparagement of Plaintiff Dr. Howard, and Defendant Daniel E. Straus directing in the ouster of Plaintiff Straus and reallocation of her interests

431.  The coordinated actions of Defendant Daniel E. Straus and Defendant Vazquez to harm Plaintiffs Straus and Dr. Howard, as evidenced by emails, text messages, and financial decisions, support a claim of civil conspiracy.

432.  As a direct and proximate result of the conspiracy, Plaintiffs have suffered the aforementioned damages including loss of employment, professional reputation harm, and emotional distress. Under New Jersey law, each Defendant who participated in or aided the conspiracy is jointly and severally liable for the full

extent of the damages caused by the wrongful acts committed in furtherance of the conspiracy.

433.   All Defendants who participated in the conspiracy are jointly and severally liable for the damages caused by the above tortious acts.

434.   Moreover, the deliberate and concerted nature of Defendants' conduct merits an award of punitive damages against the co-conspirators.

435.   Further, Plaintiffs have been required to retain an attorney to assist Plaintiffs in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs Straus and Dr. Howard demand judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT XV
### Tortious Interference with Prospective Economic Advantage
### (Plaintiff Straus and Dr. Howard Against All Defendants)

436.   Plaintiffs Straus and Dr. Howard repeat and reallege the allegations set forth above as if fully stated herein.

437.   Prior to and at the time of the events in question, Plaintiff Dr. Howard had valid and reasonable expectancies of economic benefit in his relationships with his patients under his care at Care One facilities, his employed medical staff, such as nurse practitioners, and referral sources who trusted him to provide care at Care One. Dr. Howard reasonably expected to continue treating those patients and to maintain those professional relationships, thereby deriving economic benefit via income and professional goodwill.

438.   Defendants knew of Dr. Howard's relationships and expectancies. They were aware that certain patients considered Dr. Howard to be their physician and that Dr. Howard's nurse practitioners and staff were committed to working with him. Defendants also knew that Dr. Howard's reputation with referral sources and the community was integral to his practice.

439.   Defendants intentionally and unjustifiably interfered with these relationships and expectancies. Defendants terminated Dr. Howard without legitimate cause, barred

him from accessing his patients, enticed his nurse practitioners and staff to leave his private practice where they were employed and join Care One, and disseminated false information to destroy trust in Dr. Howard. These actions were taken not for any legitimate business reason, but out of retaliation and malice toward Dr. Howard.

440.   As a direct and proximate result of Defendants' interference, many of Dr. Howard's patients ceased their relationship with him, remaining at Care One with other providers instead, and his nurse practitioners and support staff left his practice. Dr. Howard's professional network and referral base were similarly damaged by Defendants' actions and statements. Consequently, Dr. Howard suffered significant economic losses, including loss of current and future patient revenues and the devaluation of his practice.

441.   Furthermore, Defendants' interference with Plaintiffs Straus and Dr. Howard's new business venture, 18 Medical, was without any legitimate justification and was motivated purely by retaliation and ill will.

442.   Defendants attempt to destroy Plaintiffs' business relationships and spread false and baseless lies to justify and discredit Plaintiffs for their wrongdoing.

443.   Defendants' conduct was willful and malicious, warranting the imposition of punitive damages for this claim.

444.   Accordingly, Defendants' actions constitute tortious interference under New Jersey law, and Defendants are liable for all damages caused by their interference.

445.   Further, Plaintiffs Straus and Dr. Howard have been required to retain an attorney to assist them in asserting their claims and protecting their rights.

**WHEREFORE**, Plaintiffs Straus and Dr. Howard demand judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

## COUNT XVI
### Invasion of Privacy/ Intrusion Upon Seclusion
### (Plaintiff Straus Against Defendants Daniel E. Straus and Care One)

446.  Plaintiff Straus repeats and realleges the allegations set forth above as if fully stated herein.

447.  At all relevant times, Plaintiff Straus had a reasonable expectation of privacy in her personal communications, medical and financial information, physical movements, and professional relationships.

448.  Between September 2023 and September 2024, Defendant Daniel E. Straus, with the assistance of Care One LLC personnel and affiliated agents, undertook a systematic and unlawful campaign of surveillance, monitoring, and personal data access designed to intimidate, discredit, and control Plaintiff.

449.  These actions included, but were not limited to:

- Monitoring Plaintiff Straus' private cell phone communications, including obtaining detailed call logs, text history, and metadata, showing hundreds of communications with Dr. Howard;

- Reviewing private records related to Plaintiff Straus' business dealings, medical providers, and family logistics — without consent or legal authority;

- Disabling Plaintiff Straus' personal cell phone number of 25 years on or about September 5, 2024, with less than 12 hours' notice, thereby:

- Cutting off access to Plaintiff Straus' children's schools, doctors, and emergency contacts;

- Blocking Plaintiff Straus' access to banking, legal, and two-factor authentication systems; and

- Causing significant emotional, logistical, and reputational harm.

450.  Additionally, Defendants caused private investigators and/or security contractors to follow Plaintiff Straus, observe her movements, and document her location, including:

- Surveillance across state lines on at least December 23, 2024, as Plaintiff Straus traveled to Washington, D.C. for legal and business meetings;

- Daily or near-daily surveillance outside her residence between November and December 2024, confirmed via license plate logs and GPS tracking records.

451. These intrusions were not authorized by any law or consent. They served no legitimate business interest and were designed solely to retaliate against Plaintiff for her protected activity; disrupt her ability to organize 18 Medical and consult with legal counsel; and humiliate, intimidate, and isolate her.

452. The acts alleged constitute a highly offensive intrusion upon seclusion under New Jersey common law and the Restatement (Second) of Torts § 652B. No reasonable person would expect their parent or employer to access private phone records, disable communication lines, or stalk them across state lines for retaliation.

453. These actions caused Plaintiff Straus to suffer severe emotional trauma, anxiety, fear, and sleep disturbance; loss of connection to family, legal, and professional networks; and concrete financial losses due to inability to conduct work and communicate.

454. As a direct and proximate result of Defendants' conduct, Plaintiff Straus seeks:

- compensatory damages for emotional distress and financial harm;
- punitive damages for the malicious, intentional nature of the conduct; and
- equitable and injunctive relief, including orders prohibiting further surveillance or data interference.

455. Further, Plaintiff Straus has been required to retain an attorney to assist Plaintiff in asserting her claims and protecting her rights.

**WHEREFORE**, Plaintiff Straus demands judgment against Defendants for compensatory damages, punitive damages, statutory damages, damages for lost wages, interest, attorneys' fees, costs of suit, and such other relief as deemed appropriate by the Court.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

      (a)      Compensatory damages;

      (b)      Damages for lost wages and earning capacity;

      (c)      Damages for mental and emotional distress;

      (d)      Punitive damages;

      (e)      Treble damages;

      (f)      Statutory damages;

      (g)      Equitable relief;

      (h)      Attorneys' fees and costs of suit;

      (i)      Lawful interest – including pre-judgment interest;

      (j)      Such other, further and different relief as the Court deems fitting, just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs respectfully demand a trial by jury on all issues in the within action so triable.

**DESIGNATION OF TRIAL COUNSEL**

JOHN J. ZIDZIUNAS, ESQ. is hereby designated as trial counsel on behalf of the Plaintiffs.

**CERTIFICATION OF NO OTHER ACTIONS OR PARTIES**

I hereby certify that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, that no other action or arbitration proceeding is contemplated, and that there are no other parties known to me at this time who should be joined as parties to this action.

**DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS**

Demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

If so, please attach a copy of each, or in the alternative state, under oath and certification:  (a) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits

**JOHN J. ZIDZIUNAS & ASSOCIATES, LLC**
**Attorneys for Plaintiffs, Elizabeth Straus,**
**Dr. Brandon Howard, and Meagan LaDue**

*/s/ John J. Zidziunas*
**JOHN J. ZIDZIUNAS, ESQ.**
*For the Firm*

**Dated: April 10, 2025**